**GREENWOOD TRUST COMPANY,**
Plaintiff,

v.

**COMMONWEALTH OF MASSACHU-SETTS and Attorney General of the Commonwealth of Massachusetts, Defendants.**

Civ. A. No. 89–2583–Y.

United States District Court,
D. Massachusetts.

Oct. 22, 1991.

Andrew Lane, Alan Feldman, Harvey Bock, Gilbert Hoy, Gaston & Snow, Boston, Mass., for plaintiff.

Stephen Jonas, Deputy Atty. Gen., Chief, Public Protection Bureau, Boston, Ernest Sarason, Asst. Atty. Gen., Consumer Protection Div., Public Protection Bureau, Boston, Mass., for defendants.

William N. Lund, Bureau of Consumer Credit Protection, Dept. of Professional & Financial Regulation, ACUCCCS President, Augusta, Me., Laura Udis, State of Colo., Dept. of Law, Denver, Colo., Steven W. Hamm, Adm'r, Philip S. Porter, Counsel to the Adm'r, S.C. Dept. of Consumer Affairs, Columbia, S.C., Leon Swerin, Legal Counsel, Office of the Com'r of Banking, Madison, Wis., Peter Kochenburger and Richard Cleland, Asst. Attys. Gen., Consumer Protection Div., Des Moines, Iowa, Gilber B. Kaplan, Morrison & Foerster, Washington, D.C., Marsha Kramarck, Deputy Atty. Gen., Delaware Dept. of Justice, Richard P. Eckman, Daniel I. Prywes, Wilmington, Del., Susan K. Hoffman, Pepper, Hamilton & Scheetz, Craig Ulrich, Consumer Bankers Ass'n, Alan S. Kaplinsky, Jeremy T. Rosenblum, Wolf, Block, Schorr and Solis-Cohewn, Philadelphia, Pa., Frank M. Salinger, Robert E. McKew, American Financial Services Ass'n, Washington, D.C., for amici.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

### I. INTRODUCTION

This case raises a variety of novel and complex issues involving the interstate ex-

tension of consumer credit via credit cards and the concomitant regulation of the issuers of such credit cards by the several states. As the parties and the *amici*[1] point out, this appears to be a case of genuine first impression, both in this Circuit and throughout the United States.[2]

The parties and *amici* have extensively and skillfully briefed the primary issue as they conceive it: May Greenwood Trust Company ("Greenwood"), a federally-insured, state-chartered bank located in Delaware, assess its "Discover" credit card holders located in Massachusetts a late charge on delinquent accounts, a charge permitted in Delaware but prohibited in Massachusetts?[3] Resolution of this important question necessarily requires the Court to address two subsidiary issues—a major question of federal preemption that concerns both the parties and the *amici*, and a lesser but potentially pivotal question of statutory interpretation of Massachusetts banking legislation, a matter that concerns the parties alone. The major question requires the Court to determine whether Massachusetts banking law is preempted under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2., by section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980, United States Pub.L. No. 96–221 § 521, 94 Stat. 132 (1980) ("DIDA"). If so, the prohibition of the Massachusetts usury law against such late charges must yield. If not, it would appear that Greenwood must prevail unless, of course, the Massachusetts usury law itself, Mass.Gen.L. ch. 140, § 114B, does not contemplate regulation of out-of-state credit card issuers such as Greenwood. Greenwood makes this argument, and the Commonwealth and its Attorney General demur.

Where, then, ought analysis begin? If Massachusetts law does not reach out-of-state credit card issuers, then this Court need not address the thorny issue of federal preemption—an issue of nationwide significance. Conversely, if federal law preempts state regulation, this federal court need not—and should not—undertake to analyze the legislative intent of the Massachusetts legislature. Here the Court ultimately concludes, first, that federal law does *not* preempt Massachusetts from barring late charges in credit card agreements; and second, that Massachusetts *may* prohibit Greenwood from collecting the presently disputed late charges under credit card agreements with Massachusetts citizens. Accordingly, though the outcome thus turns ultimately upon state law, resolution of the federal preemption issue is likewise necessary to determine whether to engage in an analysis of the Massachusetts statute.[4]

1. *Amicus curiae* briefs in support of the Greenwood Trust Company have been filed by the Delaware State Bank Commissioner and Delaware Bankers Association, Consumer Bankers Association, American Financial Services Association, Mastercard International, Inc., and VISA USA, Inc.

   The following have filed *amicus curiae* briefs in support of the Commonwealth of Massachusetts and its Attorney General: the states of Iowa, Maine, Minnesota, South Carolina, and Wisconsin ("the amici states"), the National Association of Consumer Credit Administrators and the American Conference of Uniform Consumer Credit Code States.

   The Court expresses its appreciation to all the *amici* for their able briefs and most helpful assistance in addressing these important issues.

2. The amici states in their brief call to the Court's attention several recent cases raising some similar issues brought in the Iowa State courts. (Amici States' Br. at 7 and n. 7, 9).

These cases, all of which settled short of judicial resolution on the merits, involved Iowa's attempt to enforce against national banks located in Iowa certain policies with respect to cardholder agreement late charges, choice of law, and other provisions.

3. More broadly stated, the issue is: may a bank located in a state with permissive consumer lending laws take advantage of those favorable non-interest rate provisions in its own state's laws and "export" them to or impose them upon residents of another state which maintains greater consumer protection for its residents when they borrow in that state?

4. Greenwood, in its complaint, alleged that Massachusetts' enforcement of its late charge prohibition would violate the Commerce clause of the United States Constitution. (Complaint, ¶¶ 1, 5, 22–25.) This claim was not, however, pressed beyond that initial mention and does not appear in any briefs or oral arguments submitted by

## II. STATEMENT OF MATERIAL UNDISPUTED FACTS [5]

The plaintiff Greenwood is a Delaware banking corporation insured by the Federal Deposit Insurance Corporation. Greenwood, through its wholly-owned subsidiary, Discover Card Services, Inc., located in Illinois, issues the "Discover" credit card to customers nationwide, including several hundred thousand residents of Massachusetts. Greenwood actively solicits cardmember applications nationwide through direct mail, telemarketing, and "take one" applications; it also conducts multi-media advertising nationwide. (Plaintiff's Answer to Interrog. No. 4).

Though Greenwood does not directly employ personnel in Massachusetts to make loans, Discover Card Services maintains a Massachusetts office with approximately eight employees. (Plaintiff's Answer to Interrog. No. 13[c] ). That office solicits merchants in Massachusetts to accept the Discover Card. *Id.*

Pursuant to its Cardmember Agreement, Greenwood charges a monthly periodic rate of 1.5 percent to accounts in all states which have opted out of DIDA and 1.65 percent to accounts in all other states.[6] Cardmember Agreement ("Agreement") ¶ 15.

Greenwood also imposes a $10.00 "late charge" if a required payment is not made within 20 days after the payment due date in any month. (Agreement ¶ 17). Failure to make at least the minimum payment due by the due date in any month puts the cardmember in default. (Agreement ¶¶ 11, 18). Greenwood does not include late charges in its computation or disclosure of the Annual Percentage Rate in either the Cardmember Agreement or monthly billing statement. (Plaintiff's Answer to Interrog. No. 15). It does separately identify the late payment charge in the Cardmember Agreement, and separately identifies finance charges and late payment charges on the monthly billing statement as "Finance Charges" and "Late Charges." *Id.;* (Agreement ¶¶ 13, 17). A Discover Card finance charge is imposed on unpaid balances which include unpaid late charges. (Dep. of Robert Stormoen at 86–88). Multiple late fees are assessed in successive billing cycles for continuing unpaid balances past the 20–day period. *Id.* at 88–90. A finance charge is then imposed on unpaid balances, including multiple late charges. *Id.* at 89–90.

The purposes of Greenwood's late charges are to deter default, compensate it for additional collection expenses, and provide it with a source of revenue in addition to interest charges. (Plaintiff's Answer to Interrog. No. 5; Stormoen Dep. at 62–63). The payment of a late charge per se does not influence Greenwood's decision as to whether to extend further credit or suspend credit privileges.[7] (Stormoen Dep. at 26).

Greenwood's late charges to Massachusetts residents involve a substantial sum of money, the amount of which the parties have agreed to keep confidential. (Statement ¶ 2). The Cardmember Agreement contains a choice of law provision specifying that the Agreement "will be governed by the laws of the State of Delaware and applicable federal laws." (Agreement ¶ 25). Greenwood has never permitted a Massachusetts resident to enter into a Dis-

---

Greenwood in connection with the present motion for summary judgment.

5. The parties agreed to submit the liability issues to the Court for resolution on their cross-motions for summary judgment. As required by Local Rule 18, the Commonwealth submitted a Statement of Material Undisputed Facts ("Statement") with its motion. Greenwood submitted no Statement in support of its motion. Thus, consistent with Rule 18, the Court takes as admitted by Greenwood the material facts set forth in the Commonwealth's Statement. Unless otherwise noted, affidavits, depositions, and other documents referred to here are attached to that Statement.

6. Massachusetts is a state which in 1981 elected to override, or "opt-out" of DIDA pursuant to Section 525 of that Act. Mass.Stat.1981 ch. 231. Fourteen other states and Puerto Rico have enacted similar legislation.

7. Both Greenwood and *amici* Mastercard and Visa have argued that late charges are either components of finance charges or material to determination of the rate of interest. This

cover Cardmember Agreement on terms different from those on its printed form agreement, including the choice of law provision.

## III. ANALYSIS

### A. *Preemption: The Federal DIDA Statute and State Usury Laws*

1. Background of Federal and Massachusetts Legislation.

The present controversy between Greenwood and Massachusetts traces to the increasingly unsettled relations among banks, state regulators, and federal authorities over the last decade, since abrupt changes in Federal Reserve monetary policies and bank deregulation have intensified interstate competition among financial institutions. The fast-growing credit card industry is a sphere of particular importance and interstate conflict as cards issued by 50,000 financial institutions and offices are now carried by over seventy million Americans, who used them in transactions amounting to well over $400,000,000,000 in 1989.[8]

Since the early years of the Republic, the states have generally resisted the development of national banks and favored their own state chartered banks through regulatory legislation[9] and the Supreme Court has, since *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), generally limited federal statutory involvement by construing preemption narrowly and giving relatively free rein to state usury law regulations. *See Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 64 S.Ct. 599, 88 L.Ed. 692 (1944); *McClellan v. Chipman*,

164 U.S. 347, 17 S.Ct. 85, 41 L.Ed. 461 (1896).

The National Bank Act of 1864, ch. 106, 13 Stat. 99 (1864), favored the national banks and protected them from discriminatory state laws;[10] and since 1933 they have been allowed to charge interest at one percent above the Federal Reserve discount rate or at the highest rate available to competing state banks under laws of the state named in their charter. Banking Act of 1933, ch. 89, § 25, 48 Stat. 191.

The interest rates of state and national banks were comparable until 1979, when the Federal Reserve rate rose sharply, giving national banks a competitive advantage in states with lower usury law interest ceilings. The national banks' advantages were further enhanced through the Supreme Court's decision in *Marquette Nat'l Bank v. First of Omaha Service Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978). The *Marquette* Court held that *national* banks were only required to comply with interest restrictions of their charter state when doing business in that state; and that they could disregard other states' interest ceilings when doing business outside their home state.[11]

The bleeding of capital from state banks to the national banks created a serious shortage of mortgage loan monies in many states by the late 1970s. The housing industry was especially affected by high interest rates and the dwindling of state bank mortgage capital.[12]

Congress responded to the unprecedented crisis of simultaneous recession and inflation by enacting DIDA[13]—the Depository Institutions Deregulation and Mone-

Court rejects that argument as untenable on the undisputed material facts of record. *See infra* at 36–39.

8. R. Burgess & M. Ciofli, *Exportation or Exploitation? A States Regulator's View of Interstate Credit Card Transaction*, 42 Bus.Law., 929 (1987); Mastercard International Inc. and VISA U.S.A., Inc. Br. 1–2.

9. O. Scroogs, *A Century of Banking Progress* 50–51 (1924), J. Knox, *A History of Banking in the U.S.* 12 (2d ed. 1969), as cited in the brief of the Consumer Bankers Association, 5–8.

10. *See Northway Lanes v. Hackley Union Nat'l Bank & Trust Co.*, 464 F.2d 855, 861 (6th Cir. 1972); Consumer Bankers Association Br. 8–10.

11. *See* Burgess & Ciolfi, *supra* note 8 at 935–36.

12. *Id. See* William M. Burke & Alan S. Kaplinsky, *Unraveling the New Federal Usury Law*, 37 Bus.Law. 1079, 1096 (1982).

13. *Usury Lending Limits: Hearings on S. 1988 Before the Senate Committee on Banking, Housing and Urban Affairs*, 96th Cong., 1st Sess. (1979) ("*Usury Lending Limits Hearings*").

tary Control Act of 1980.[14] Section 521 of DIDA allowed state banks, like the national banks, to charge interest at the federal rate and thereby preempted state usury laws. 12 U.S.C. § 1831d. At the same time, Congress also recognized the continued importance of state consumer protection laws. Section 525 of DIDA gave states three years to enact legislation to override the preemption provisions of the federal Act. 12 U.S.C. § 1730g note.

Spurred by the same financial crisis, Massachusetts in 1981 joined other states in amending its usury statute to raise the ceilings on interest rates for state-chartered financial institutions.[15] The Commonwealth and 14 other states elected to opt out of DIDA preemption as allowed under section 525.[16] Massachusetts raised its usury limit on open end credit card accounts to an across-the-board level of 18% and prohibited the levy of late charges on Massachusetts credit card customers.[17]

In contrast to the efforts of Massachusetts and states which sought to preserve usury laws through reform, a handful of states, most notably Delaware and South Dakota, responded to the credit crisis and the *Marquette* decision by passing laws which virtually eliminated interest rate and other usury restrictions.[18] Delaware, in an effort to attract credit card issuers, completely deregulated its credit card issuers, encouraging banks such as Greenwood to locate there.[19] (Def's Mem.Supp.Summ.J. at 2–3; Amici States Br. at 6).

The controversy presently before this Court is most immediately concerned with the preemptive sweep of DIDA's section 521 and the reach of the Massachusetts usury law, Mass.Gen.L. ch. 140, § 114B. But this case, in a larger sense, is part of the constant challenge to strike the proper balance of federalism in a society of constantly evolving needs and aspirations.

### 2. Pathways to Preemption and Comparative Burdens.

Greenwood argues that the Commonwealth's enforcement of the late charge provisions of its consumer protection statute would conflict with the anti-discriminatory consumer lending provisions of Section 521 of DIDA, 12 U.S.C. § 1831d ("section 521"). That section allows state-chartered banks insured under the Federal Deposit Insurance Act, to charge interest at a federal rate and preempts conflicting state laws, as follows:

(a) Interest rates

In order to prevent discrimination against State–chartered insured depository institutions, including insured savings banks ... with respect to interest *rates*, if the applicable *rate* prescribed in this subsection exceeds the *rate* such State bank ... would be permitted to charge in the absence of this subsection, such State bank ... may, *notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section,* ... charge on any loan or discount made ..., interest at a *rate* of not more than 1 per centum in excess of the discount *rate* on ninety-day commercial paper in effect at the Federal Re-

---

**14.** DIDA was omnibus legislation that, in the respects relevant here, amended various statutes, including the Home Owners Loan Act (Section 501), the Federal Deposit Insurance Act (Section 521), the National Housing Act (Section 522), and the Federal Credit Union Act (Section 523). Each of these sections is amended by and subordinated to Title V of DIDA.

**15.** Mass.Gen.L. ch. 140, § 114B, *amended by* Mass.Stat.1981, ch. 384, § 1.

**16.** *See* 12 U.S.C. 1730g.

**17.** *See* note 15. In 1984, the 18% limit was modified slightly under circumstances not here relevant. Mass.Stat.1984, ch. 489, § 1.

**18.** *See* Burgess & Ciolfi, *supra* at 935–36.

**19.** Delaware's 1981 Financial Center Development Act "among other things ... eliminated rate limitations on all classes of loans, liberalized Delaware's consumer lending law, and established a favorable tax structure for banks." Richard P. Eckman, *The Delaware Consumer Credit Bank Act and "Exporting" Interest Under Section 521 of The Depository Institutions Deregulation and Monetary Control Act of 1980,* 39 Bus.Law. 1264–65 (1984) (footnotes omitted) ("Eckman"). *See generally* Del.Code Ann. tit. 5, §§ 941–974. The Consumer Credit Bank Act of 1983 was designed to encourage small banking organizations to locate in Delaware to engage in interstate consumer lending.

serve bank in the Federal Reserve district where such bank ... is located or at the *rate* allowed by the laws of the State ... where the bank is located, whichever may be greater. (emphasis added)

By these literal terms, preemption under section 521 is limited to state *interest rates* which conflict with the federal rate permitted by that provision. It was, as noted above, the unprecedented rise in the Federal Reserve discount rate in the late 1970's which gave rise to DIDA. The plain meaning of section 521 does *not* evince Congressional intent to preempt state regulation as to other credit terms, apart from interest rates, such as the late charges challenged by Massachusetts.

Greenwood and its allied *amici* argue that section 521's stated purpose, "... to prevent discrimination against State–chartered insured depository institutions" translates into a "national policy of providing [federally] insured [state] banks competitive 'rate' parity with national banks." (Def's Mem.Opp'n.Summ.J. at 8). Such an ambitious policy, it is said, necessitates broad preemption of not only numerical interest rates, but all state restrictions on credit terms (including late charges) which affect the profits of lenders. *Id.* at 8–9.

This larger Congressional intent is said by Greenwood to be manifest in the legislative history of section 521 and unmistakably *implied* by Congressional policy objectives advanced in other provisions of DIDA, from interpretive decisions of various administrative agencies, and from court decisions interpreting either the National Bank Act or the meaning of "rates" under that or other federal consumer protection statutes.

Massachusetts, countering, essentially relies upon the plain meaning of the "interest rate" language in section 521 and the history of Congressional deliberations prior to enacting DIDA. That evidence is said to demonstrate that Congressional concern was limited to discriminatory interest rates favoring national banks, and that preemption was intended to apply only to state interest rate ceilings. State usury laws thus would remain vital and controlling

over non-interest rate credit terms. The amici states also assert that consumer credit protection is a fundamental local interest, long recognized by Congress, and not displaced by the sweeping preemption urged by Greenwood.

This Court's assessment of preemption under section 521 is framed by two essential questions:

First, did Congress intend a limited or broad incursion upon state usury laws? Was the aim to cure interstate discrimination only in interest rate ceilings (based upon the literal language of section 521) or is it implicit that the larger Congressional aim was to establish a more uniform national credit card lending framework?

Second, did Congress impliedly intend by its use of the term "rates" in DIDA to preempt state law restrictions on all credit terms (including late charges) as well as state regulation of numerical interest rates standing alone?

The Court, in considering preemption claims, is cautioned by the longstanding presumption that "Congress did not intend to displace state law," *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981), and that it should not unnecessarily disturb "the federal-state balance." *United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971). Indeed, greater restraint ought apply to preemption of spheres traditionally occupied by the states, as noted in the oft-cited language of *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947):

Where ... the field that Congress is said to have preempted has been traditionally occupied by the states ... we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless there was the clear and manifest purpose of Congress.

■ It is well settled that state usury law restrictions on lending practices are so extensive and historically rooted as to form part of the consumer protection terrain

"traditionally occupied" by the states.[20] Accordingly, "[b]ecause consumer protection is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area." *General Motors Corp. v. Abrams*, 897 F.2d 34, 41–42 (2d Cir.1990) (upholding New York's "Lemon Law" against a claim that a Federal Trade Commission consent decree preempted major elements of the local law).

■ Moreover, preemption analysis requires consideration of several distinct criteria. *See Palmer v. Liggett Group, Inc.*, 825 F.2d 620, 624–25 (1st Cir.1987). The crucial question underlying such an inquiry is always "whether Congress intended that federal regulation supercede state law." *Id.*, quoting *Louisiana Public Service Comm'n v. Federal Communications Comm'n*, 476 U.S. 355, 369, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986). Of course, express statutory terms are the surest indicator of preemptive intent. Where provisions are unclear or fail to address the preemption question, a cautious resort to legislative history is called for. *American Tobacco Co. v. Patterson*, 456 U.S. 63, 75, 102 S.Ct. 1534, 1540–41, 71 L.Ed.2d 748 (1982). Implied preemption is more difficult to establish; one must consider "the relationship between state and federal laws as they are interpreted and applied, not merely as they are written [and] determine whether ... [they] are so inconsistent that the state law must give way...." *Jones v. Rath Packing Co.*, 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604 (1977); *see also Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963) (pointing to the "physical impossibility" of simultaneous compliance with federal and state laws as a directive for preemption). Further, preemption may be inferred from the overall scope of a statute if Congress has legislated so comprehensively as to occupy the entire field and leave no room for interstitial regulation by the states, *Rice*, 331 U.S. at 230, 67 S.Ct. at 1152.

■ Finally, a litigant not anchored to specific federal provisions may argue that preemption is implicit because "state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress" as generally discerned in a federal statute. *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984); *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

■ Greenwood embarks upon two routes to preemption. First, selected aspects of the legislative history of DIDA are singled out and highlighted as explicit indications of Congress' broad preemptive intent. In the alternative, Greenwood and its *amici* banks seek to travel a more precarious route, attempting to imply preemption from the contradiction between the Massachusetts usury law against late charges and the accomplishment of what Greenwood calls a broad Congressional purpose to develope "competitive parity" between federal and state banks through a more uniform credit system. (Greenwood's Mem.Opp'n.Summ.J. at 8–9; Mastercard and VISA Br. at 3). Accomplishment of this larger Congressional purpose, according to Greenwood, requires that federal law preempt all state usury restrictions which "affect a lender's economic return." (Greenwood Br. at 13).

Greenwood's case for this overriding Congressional purpose depends substantially upon an expansive reading of the "most favored lender" doctrine established by the National Bank Act of 1864 and elucidated in the landmark case of *Marquette Nat'l Bank v. First of Omaha Service Corp.*, 439 U.S. 299, 99 S.Ct. 540 (1978) which antedated the enactment of DIDA by two years.

---

**20.** *See Lewis v. BT Invest. Managers, Inc.*, 447 U.S. 27, 38, 100 S.Ct. 2009, 2016, 64 L.Ed.2d 702 (1980) ("We readily accept the submission that, both as a matter of history and as a matter of present commercial reality, banking and related financial activities are of profound local concern"). *See generally* Barbara A. Curran, *Legislative controls as a response to consumer-credit problems,* 8 Boston College Industrial and Commercial Law Review, 409, 413–15, 418–20 (1967).

The Commonwealth, defending its usury restrictions, argues that Congress intended, when enacting DIDA and section 521 in particular, to preempt state laws restricting only numerical interest rates and "not those laws concerning non-interest rate loan terms." (Commonwealth's Mem.Supp. Summ.J. at 9). Championing the vitality of state prohibitions against late charges, the Commonwealth and the amici states cite the express terms of section 521, the legislative history of section 501 of DIDA, additional federal consumer statutes, and two state supreme court decisions.

### 3. Legislative History of DIDA and its Section 521.

The record of Congressional debate and deliberation concerning the enactment of DIDA is generally supportive of the Commonwealth's argument that preemption of credit card regulation under DIDA is confined to numerical interest rates. The central unifying purpose of DIDA was to provide for increased access to home mortgage loans. Section 501 of DIDA provided for preemption of state usury limits on mortgage loans in a manner virtually identical to the treatment of other loans (including credit card agreements) in Title V, which contains the disputed section 521.

Massachusetts cites the Senate Report of deliberations over section 501 of DIDA which limits preemption and expressly exempts "late charges." Senate Report No. 96–368, 96th Cong., 2d sess. 19 (reprinted in 1980 U.S.Code Cong. and Ad.News, Vol. 2, 236, 255):

> In exempting mortgage loans from state usury limitations, the Committee intends to exempt only those limitations that are included in the annual percentage rate. The Committee does not intend to exempt limitations on prepayment charges, attorney fees, late charges or similar limitations designed to protect borrowers.

Greenwood dismisses this Senate Report as irrelevant because it was prepared prior to consideration of section 521. Greenwood's view, however, disregards the subsequent legislative history which links preemption concerns in section 501 both to the consideration of section 521, and to DIDA in its entirety as passed on March 27–28, 1980. Massachusetts points out that Congress passed section 501 at the same time, and in the same title (Title V) of the same act, as section 521. (Commonwealth Reply at 2).

During discussion on the Senate floor of the various bills which figured in the development of DIDA, Senators Pryor and Bumpers proposed an amendment to give state-chartered institutions "competitive equality" with national banks by allowing them to charge interest at one percent above the federal discount rate. S.1988, 125 Cong.Rec. 30655 (November 1, 1979). Senator Proxmire, floor manager of the Senate bills under discussion, and chairman of the Senate Banking Committee, understood the proposed amendment to override state usury laws and emphasized that there was "a sharp division and difference of opinion in the Senate." *Id.*

Separate hearings on the Pryor–Bumpers initiative, S.1988, 96th Cong. 1st Sess. (1979) were held on December 17, 1979, and, though it was not reported out of committee, the bill's language was substantially incorporated into House Bill 4986, H.R. 4986, 96th Cong., 1st sess. (1979), which was, in turn, enacted as DIDA. Burke & Kaplinsky, *supra*, at 1096–97 and n. 102; *Usury Lending Limits Hearings.*

Greenwood and its *amici* assert that Congressional commitment to a "national policy" of "competitive rate parity" through uniform national credit terms is manifest in the Senate consideration of the Pryor–Bumpers bill, S.1988. They have emphasized certain testimony at the Usury Lending Limits Hearings from various agency administrators and financial industry officials as evidence of a sweeping intent to eliminate all discrimination in credit terms between state banks and national banks. (Consumer Bankers Association's Br. at 13 [citing *Usury Lending Limits Hearings* at 2, 19, 20–21, 32, 36, 37, and 153–54]; American Financial Services Association's Br. at 8–11).

A fair reading of the legislative history, however, indicates that Congressional con-

cern was focused with particularity on numerical interest rates. In introducing S.1988, Senator Pryor noted, "A national bank may charge one percent above the Federal discount rate, notwithstanding any State laws setting an interest-rate ceiling ... [which] obviously discriminates in the strongest possible way against State banks." 125 Cong.Rec. 30655 (November 1, 1979). The great bulk of the subsequent committee testimony and discussion indicates that the proposed preemption amendment was limited since, in Senator Pryor's words, it "would merely allow State chartered, federally insured banks ... to charge the same interest rate as national banks." *Id.* In fact, there were only two references to wider displacement of state law through expansion of the "most favored lender doctrine;" and these are the references upon which Greenwood relies so heavily in inferring a broader Congressional purpose.[21] Senator Bumpers, *co-sponsor* of the preemption amendment, confined his remarks to numerical interest rate disparities and remarked pointedly, "I do not think it is particularly healthy to be overriding state law." *Id.*

Even if the sponsors and supporters of DIDA preemption provisions were shown to be committed to achieving total competitive equality of all lending terms offered by state banks and national banks, Greenwood fails to come to terms with the simultaneous and persistent concerns of the bill's sponsors to preserve state consumer protection. During Senate consideration of the conference report on March 27, 1980, Senator Proxmire emphasized the limited preemptive scope of Title V.[22] This limitation in DIDA's Title V is clear from the Senate floor discussions of mortgage loans, from the Senate Banking Committee Report, and from the hearings on DIDA in the House of Representatives.[23]

Greenwood's arguments for implied preemption as necessary to implement a clear Congressional goal can hardly stand if Congress actually sought to accommodate state usury restrictions in section 521. It is not surprising, therefore, that Greenwood and its *amici* ignore entirely the significance of the override provision of section 521, codified at 12 U.S.C. § 1735f-7 Note, which is also common to section 501 and other sections of the statute. Those provisions expressly provided that states could, within three years of April 1, 1980, declare that they wished not to be bound by the Act's limited preemption of their states' laws. Massachusetts so declared on June 4, 1981.[24] By April 1, 1983, 14 other

---

**21.** *See Usury Lending Limits Hearings, supra,* at 32, 36, 37, 64–65, 151, 153–54; *see also* Burke & Kaplinsky, *supra,* at 1096–97 and n. 105.

**22.** 126 Cong.Rec. S. 6900 (March 27, 1980).

> [T]he Government must seek ways to remove competitive restrictions....
>
> Title V does this by preempting various usury laws while giving each State the opportunity to reestablish its usury limitations if it desires to do so....
>
> ....
>
> I wish to reemphasize the point made initially in the Senate Banking Committee report that in exempting mortgage loans from State usury limitations, we intend to exempt only those limitations that are included in the annual percentage rate. We do not intend to exempt limitations on prepayment charges, attorneys' fees, late charges or similar limitations designed to protect borrowers.
>
> ....
>
> Title V also contains a provision which provides parity, or competitive equality, between national banks and State chartered depository institutions on lending limits.

**23.** An official of the Federal National Mortgage Association, in response to an inquiry by Rep. St. Germain, Chair of a House subcommittee considering DIDA, referred to the Senate Banking Committee Report cited above and stated:

> This expression of legislative intent not to displace state laws designed for consumer protection with regard to charges other than charges treated as interest would leave in place those protective enactments in the various states that relate to prepayment penalties, *late charges,* regulations on disclosure of interest charges and restrictions on other costs in connection with loan transactions *other than interest.*

*Regulation Q. and Related Measures: Hearings Before the Subcommittee on Financial Institutions of the Committee on Banking, Finance and Urban Affairs,* 96th Cong., 2d Sess. 125–26 (1980). (emphasis added)

**24.** Mass.Stat., 1981, ch. 231, "An Act Exempting the Commonwealth From the Usury Preemption Provisions of the 1980 Deregulation and Monetary Control Act," approved June 4, 1981 and effective by operation of law September 4, 1981.

states and Puerto Rico had similarly chosen not to be bound by DIDA preemption.[25]

The Commonwealth, relying on this history, argues that in the face of Congressional silence as to the specific preemptive intent of section 521, the Court may reasonably infer that Congress intended to give the same limited meaning to preemption provisions throughout Title V of DIDA. *See Firestone v. Howerton,* 671 F.2d 317, 320 n. 6 (9th Cir.1982) ("We follow the well-known maxim of statutory construction that, when the same terms are used in different sections of a statute, they receive the same meaning"); *accord, Little People's School, Inc. v. United States,* 842 F.2d 570, 573 (1st Cir.1988).

> The opt-out provision refers to "loans, mortgages, credit sales and advances *made in this commonwealth,"* (emphasis added), and it expressly refers to section 521 of DIDA. A 1986 amendment expressly applied to out-of-state loans by Massachusetts banks. Mass.Stat., 1986, ch. 177. Though it refers to "loans, mortgages, credit sales and advances," it does not refer to section 521 of DIDA.
>
> The prohibition of late charges in open-end credit accounts, contained in Mass.Gen.L. ch. 140, § 114B, was enacted on August 6, 1981, and became effective by emergency declaration of the Governor filed August 19, 1981. Mass.Stat., 1981, ch. 384, § 1. Thus, the late charge prohibition was law when the Commonwealth's preemption opt-out became effective on September 1, 1981. By implication, then, Massachusetts intended that DIDA *not* preempt its legislative decision to prohibit late charges on open-end credit accounts. A question left open is whether the Massachusetts legislature thought its provision applied to late charges on loans originating in another state, such as Delaware. *See infra* at 43–45.

**25.** The other 15 opt-outs include: Alaska, Colorado, Georgia, Idaho, Iowa, Kansas, Maine, Minnesota, Nebraska, Nevada, North Carolina, Puerto Rico, South Carolina, South Dakota, and Wisconsin. *See One Hundred Years of Ineptitude,* 70 Va.L.Rev. 1101, 1109 n. 92 (1984). The Court notes that five of these states have joined as *amici* in support of the Commonwealth. It also notes that the second *amicus* in support of the Commonwealth, the American Conference of Uniform Consumer Credit Code States, is filed on behalf of six of the above states, plus Wyoming, Indiana, and Oklahoma.

**26.** S. 730, the "Credit Deregulation and Availability Act of 1983," would have amended Title

Post–DIDA legislative history tends to confirm the conclusion that Congress in 1980 did not intend to bar states from prohibiting late fees by credit card issuers. In 1981 and in 1983–84 the Senate (but not the House) passed amendments to DIDA which would have expanded preemption of state usury laws, but would have *expressly* exempted late charges from preemption. *Hearings on S. 730 Before the Senate Committee on Banking, Housing and Urban Affairs,* April 12, 1983; Hearings on S. 1720, 1981.[26] The failed S. 730 bill also expressly granted States the right to override preemption.[27] The consistent and express limitations of these later bills certainly comport with Massachusetts' reading of the predecessor section 521 as confined to preemption of interest rates only.[28]

V of DIDA to provide, in relevant part, as follows:

> Sec. 531. The provisions of the constitution or laws of any State prohibiting, restricting, or in any way limiting the rate, nature, type, amount of, or the manner of calculating or providing or contracting for covered charges that may be charged, taken, received or reserved shall not apply to an extension of consumer credit made by a creditor.
>
> Sec. 532. (a) As used in this part—
>
> (1) The term 'covered charges' means—
>
> (A) interest, discount, points, a time price differential, or any similar fees, charges, or other compensation paid to the creditor and arising out of the credit agreement or transaction for the use of credit or credit services. *The term shall not include, however, fees, charges, or other amounts paid to the creditor or arising out of the credit agreement or transaction that are paid or arise solely as the result of the failure or refusal of the debtor to comply with the terms and conditions of the debtor's agreement with the creditor, including without limitation the fact that the obligation is not repaid in accordance with the payment schedule. ...*
>
> 129 Cong.Rec.S. 17045–17046 (November 18, 1983) (emphasis added).

**27.** It would also have given continuing effect to Massachusetts' 1981 override of the DIDA preemption provisions: "In addition, the bill preserves the actions of those States which have already rejected the Federal preemption of business and agricultural interest rate ceilings contained in the 1980 Act." 129 Cong.Rec.S. 2332 (March 8, 1983) (Statement of Senator Garn).

**28.** At least one commentator who has advocated the position taken by Greenwood here does not understand Congress to have permitted preemption of non-rate charges by enacting DIDA:

Both the California and Texas Supreme Courts, after reviewing the legislative history of DIDA, afforded Title V only a narrowly construed preemption of their states' usury laws. In *Seiter v. Veytia*, 756 S.W.2d 303, 304–05 (Tex.1988), the court held that section 501 did not preempt Texas law relating to usurious late charges. There, a seller of residential property, while conceding that DIDA was not intended to cover late charges on mortgage loans, argued that state law was nonetheless preempted since under Texas law late charges are considered interest and thus a part of the annual percentage rate. The court rejected the contention that state law could be used to define interest more broadly than Congress had intended. *Id.* at 305.[29]

In *Perdue v. Crocker Nat'l Bank*, 38 Cal.3d 913, 216 Cal.Rptr. 345, 702 P.2d 503 (Cal.1985), *appeal dismissed*, 475 U.S. 1001, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986), the California Supreme Court considered another section of DIDA which provided for gradual removal of federal regulations limiting interest paid to depositors. The court held that neither DIDA nor the National Bank Act preempted state regulation of bank service charges for overdrafts, relying on the language of the Senate Report regarding "late charges or similar limitations designed to protect borrowers." *Id.* at 522–23 and n. 37 (quoting Sen.Rep. No. 96–368, 1st Sess., p. 19 [1979]). Though not squarely on point here, *Perdue* does reinforce skepticism that in enacting DIDA Congress intended more than a limited intrusion into state substantive regulation of consumer transactions.

> Whether *Marquette* presages a far-reaching federal choice-of-law principle or one that only applies to interest rates is another issue for future resolution.... Case-by-case resolution of the issues discussed here is an unattractive prospect. Consequently, Congress and the appropriate regulatory agencies should be strongly encouraged to adopt new legislation or regulations that will clearly authorize national banks and other federally insured depository institutions to export annual fees and other non rate charges.
> Jeremy Rosenblum, *Exporting Annual Fees*, 41 Bus.Law. 1039, 1046–47 (1986).

**4. An Evolving Preemptive Purpose? The "most favored lender" doctrine under the National Bank Act, *Marquette*, and administrative decisions.**

Greenwood and its *amici* argue that the statutes, administrative and court decisions which preceded DIDA point to a Congressional commitment to the equalization of credit terms in interstate banking and a legacy of widening preemption. Congress' purported intent to encourage uniform lending practices through section 521 is said to be a logical consequence of the "most favored lender" doctrine created in the National Bank Act of 1864 and developed in jurisprudence capped by the *Marquette* decision of 1978. Greenwood's Reply at 2; Greenwood's Mem.Opp'n.Summ.J. at 13–14. Greenwood would have this Court apply the familiar rule that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change." *Merrill Lynch, Pierce Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n. 66, 102 S.Ct. 1825, 1841 n. 66, 72 L.Ed.2d 182 (1982) (citations omitted) (quoting *Lorillard v. Pons*, 434 U.S. 575, 580–81, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 [1978]).[30]

The available legislative history, discussed above, affords little support for Greenwood's argument that Congress, in enacting section 521, sought to develop fully the most favored lender doctrine and thereby eliminate *all* differences in national and state restrictions on credit card lending terms.[31] However, some friendly authority is found in administrative decisions which deem the most favored lender doctrine from section 85 of the National Bank

---

**29.** *Seiter* reached this result even though Texas had not chosen to exercise its right to opt-out of DIDA preemption under section 501(a)(2)(B). *Id.* at 304.

**30.** *See Carolene Products Co. v. United States*, 323 U.S. 18, 26, 65 S.Ct. 1, 5, 89 L.Ed. 15 (1944) ("When words employed in a new statute had, at the time, a well known meaning in the law, the words are deemed to have been used in the sense of such meaning unless the context requires a different interpretation").

**31.** *See* Burke & Kaplinsky, *supra*, at 1094–99.

Act to have been incorporated in section 521 of DIDA. Greenwood notes that the language of section 30 of the National Bank Act which, as amended, is today 12 U.S.C. 85, closely parallels that of DIDA section 521, authorizing state-chartered banks to charge interest "at the rate allowed by the laws of the State ... where the bank is located." Since 1936, the Comptroller of the Currency, the agency charged with enforcement of the National Bank Act, has interpreted section 85 as allowing a national bank to "export" to its operations in other states any interest rate permitted to competing lenders by the state law of the state in which the national bank is chartered. *See* 12 C.F.R. § 7.7310(a) (1978). This is the "most favored lender doctrine" as originally enunciated in *Tiffany v. National Bank of Missouri*, 85 U.S. [18 Wall] 409, 21 L.Ed. 862 (1874).[32]

The Supreme Court, in *Marquette*, 439 U.S. at 314 n. 26, 99 S.Ct. at 548 n. 26 (noting, with apparent approval, the Comptroller's interpretation) relied on the National Bank Act and its most favored lender doctrine, to allow a national bank chartered in Nebraska to charge its credit card customers in Minnesota a rate of interest authorized in Nebraska, but prohibited by usury law restrictions in Minnesota. 439 U.S. at 313–15, 99 S.Ct. at 548–49. The *Marquette* court recognized that the "exportation" of interest rates from a national bank's "home State" (where chartered) into a foreign state would "significantly impair the ability of States to enact effective usury laws," but it found that such impairment "has always been implicit in the structure of the National Bank Act since citizens of one State were free to visit a neighboring State to receive credit at foreign interest rates." *Marquette*, 439 U.S. at 318, 99 S.Ct. at 550 (citation omitted) (footnote omitted).

The Court suggested Congressional action would be necessary to check the preemptive effect of the National Bank Act in a time of national bank deregulation, tightened credit availability, and an increasingly nationalized credit card lending system:

> This impairment may in fact be accentuated by the ease with which interstate credit is available by mail through the use of modern credit cards. But the protection of state usury laws is an issue of legislative policy, and any plea to alter § 85 to further that end is better addressed to the wisdom of Congress than to the judgment of this Court.

*Id.* at 318–19, 99 S.Ct. at 550.

The decision in *Marquette* has been taken by lenders and issuers of credit cards to establish a *de facto* national interest rate, with exportation of the most profitable credit terms allowed under laws of lender-friendly states such as Delaware.[33] It is notable that section 521, in seeming response to *Marquette*, contains express preemption language ("notwithstanding any State ... statute which is hereby preempted for the purposes of this Section") which reaches beyond the preemptive scope of section 85 of the National Bank Act.

Greenwood's projections of sweeping Congressional purpose implying wholesale preemption are undone, however, by a closer reading of the reasoning in *Marquette*. The driving concern there was protection of the system of *national* banks established by the National Bank Act—banks which have long been "National favorites" of Congress. *Id.* at 313–14, 99 S.Ct. at 548. Congress assumed that each national bank was "located" in the state named in its organization certificate, with lending terms governed by the laws of that "home state". *Id.* at 310, 99 S.Ct. at 546. If the Nebraska-based national bank was obliged to con-

---

**32.** Actually, *Tiffany* held only that section 85 permitted a national bank to charge the interest rate allowed to natural persons by the state where the national bank is located, even if that rate exceeds the rate allowed to state-chartered banks. The case "left unanswered the question of whether 'the rate allowed by the laws of the State ... where the bank is located' includes the special state interest rate statutes applicable to regulated lenders which typically constitute exceptions to a state's general usury law. The same question remains unanswered under sections 521 through 523 of [DIDA]." Burke & Kaplinsky, *supra*, at 1096.

**33.** *See* Burgess & Ciolfi, *supra*, at 935–36.

duct its business in Minnesota under the latter's laws, its "location ... [would] depend on the whereabouts of each credit card transaction," *id.* at 312, 99 S.Ct. at 547, and such a result would "throw into confusion the complex system of modern interstate banking." *Id.*

The factual underpinning of *Marquette* cannot be ignored in the rush of lenders to embrace the Supreme Court's general recognition of "the interstate nature of American banking" and the displacement of some state laws governing 'interstate loans' by the National Bank Act. *Id.* at 315, 318, 99 S.Ct. at 547, 550. *Marquette* preemption is limited factually to numerical interest rates, with no mention of the exportation of other credit card terms, such as late charges. Greenwood, as a Delaware-chartered *state* bank, is no "National favorite" as was the Nebraska bank, nor can Massachusetts' defense of its usury laws be equated with the position taken by Minnesota with respect to the Marquette bank, a position which the Supreme Court held so directly threatened the structure of the national bank system established under the National Bank Act. Delaware does not enact law on behalf of Congress. The ex-

port of Delaware law to control the credit transactions of its banks in other states is not essential to preserve the legal identity of Delaware banks or the *state* banking system.

Even if it is accepted that section 521 is an outgrowth of *Marquette*, it does not follow that the particular Congressional purpose and preemptive sweep of the National Bank Act extend through *Marquette* to section 521 of DIDA. The Civil War Congress that enacted the original National Bank Act in 1863 expressly intended to create a *national* banking system,[34] and exportation of rates by national banks was essential to prevent the discriminatory effects of state usury laws which traditionally favored state-chartered banks. 439 U.S. at 314–17, 99 S.Ct. at 548–50. In contrast, the legislative history of DIDA, as already noted above, is extremely deferential to the state-federal balance, and the exportation of credit terms by state banks was apparently intended to prevent *intrastate* discrimination by state laws favoring local banks against foreign state banks doing interstate business.[35]

The most notable divergence between the National Bank Act and DIDA, of course, is

**34.** The nationalist nature of this legislation can hardly be overemphasized. As originally enacted in 1863 and amended in 1864, the National Bank Act was a significant war measure designed to strengthen the central government and enable it to finance its widespread combat operations. After all, this is the same session of Congress that enacted the first draft law in our national history. " 'The policy of this country,' [said] Senate Finance Committee chairman John Sherman, 'ought be to make everything national as far as possible; to nationalize our country so that we shall love our country.' " J. McPherson, *Battle Cry of Freedom*, 594 quoting Sherman's remarks as found in B. Hammond, *Sovereignty and an Empty Purse: Banks and Politics in the Civil War*, 326–27. Salmon P. Chase, Secretary of the Treasury, pressed for enactment of the National Bank Act "to augment the market for war bonds." J. McPherson, *Battle Cry of Freedom*, 593–94.

As Senator Robert C. Byrd remarks in his work, *The Senate 1789–1989* at 258:
> Designed to replace the corrupt, decentralized, and inefficient system of state banks and bank notes, the National Banking Act was largely the work of Secretary [of the Treasury] Chase and Senate Finance Committee member John Sherman. It had three objec-

tives. They include creation of a market for war bonds, reestablishment of the central banking system destroyed during the Jackson administration, and development of a stable bank-note currency. As amended in 1864, the Banking Act permitted banks to obtain federal charters and issue national bank notes up to 90 percent of their holdings of United States bonds. With modifications, this system remained the backbone of the nations's monetary structure until creation of the Federal Reserve System in 1913.

*See Congressional Globe*, 37th Cong., 3d sess., pp. 840–52, 896–97; L. Curry, *Blueprint for Modern America: Non–Military Legislation of the First Civil War Congress* (1968) 197–206.

**35.** "To the extent that national banks and federally insured institutions are not *borrowing* rates, they are not operating pursuant to authority conferred by the most favored lender doctrine....

Institutions that export rates and terms from states such as Delaware with general credit laws [i.e., laws that do not discriminate against banks chartered in their states] are not *borrowing* the state law under which those terms are authorized. Only competitors' rates may be borrowed." Burgess & Ciolfi, *supra*, at 938.

that states were given no escape from National Bank Act supremacy, while section 525 of DIDA allows states to override the preemptive effect of DIDA by reasserting state usury ceilings otherwise preempted. 12 U.S.C. § 1730g note. (*See* Commonwealth's Mem.Supp.Summ.J. at 8 n. 11). Indeed, it is not at all clear that section 521 allows state banks to export even numerical interest rates to a state which, like Massachusetts, has opted out of DIDA preemption under section 525. The transubstantiation of the sweep of preemption under the National Bank Act via the blessing of *Marquette* into a like preemption under DIDA falters on this point. It is hard to square Greenwood's view that *Marquette* inspired section 521 with the fact that, "[t]here is only one reference to *Marquette* in the legislative history of sections 521 through 523 of the Act." [36]

Greenwood's portrayal of *Marquette* as the preemptive bridge over state usury laws which spans the distance from the National Bank Act to DIDA, does draw some support from one federal court and several agency informal interpretive rulings. In *Gavey Properties/762 v. First Financial Sav. & Loan Ass'n*, 845 F.2d 519 (5th Cir.1988), the court held that under section 522 of DIDA, 12 U.S.C. § 1730g(a), a savings and loan institution located in Illinois could export its most-favored lender rate on commercial mortgages to a resident of Texas, a state which had a lower ceiling. This, the court held, was not a usurious practice under Illinois law. The court in *Gavey* arrived at its result partly in deference to a 1982 advisory opinion of the Federal Home Loan Bank Board ("FHLBB"). 845 F.2d at 521.[37]

In 1988, staff counsel of the FDIC issued an advisory opinion which also stated that section 521 incorporated *Marquette:*

Section 521 preempts State usury laws in two ways. It gives insured State banks the right [to] charge a Federally-prescribed rate on loans. It also says an insured State bank may 'export' its home state's interest rate—i.e., that the bank may charge the highest rate allowed in the State where the bank is located, no matter where the borrower may be located.

Opinion of Douglas H. Jones, Deputy General Counsel, FDIC–88–45 (June 29, 1988) Fed.Banking L.Rep. (CCH) § 81.110.

The FDIC opinion further stated that the State's right under section 525 to "countermand" federal preemption "belongs to the State where the loan is made.... The fact that a State has countermanded under section 525 should not affect the usury preemption of section 521 for a bank not located in that State, so long as the loan is not made in the State that has countermanded." *Id.*

On its face, this opinion seems to support Greenwood's view that the Commonwealth's having opted-out of DIDA cannot trump Greenwood's right to export its interest rates pursuant to Delaware law and *Marquette.* The opinion also noted, however, that the purpose of section 525 was to "preserve principles of federalism. Recognizing that section 521 deprived States of authority over matters traditionally committed to State control, Congress enacted section 525 in order to enable States to recover authority that section 521 had taken away." *Id.* It seems difficult to square the result reached by the FDIC counsel with his concerns for federalism: that is, why should Massachusetts, a sovereign state, be deprived of authority over the traditional matter of setting its own usury limits on the ground that Congress prohib-

---

**36.** Burke & Kaplinsky, *supra,* at 1104 and n. 139 (citing statement of Georgia Commissioner of Banking).

**37.** "[I]t is the view of this Office that the most favored lender status conferred by § 522 on insured institutions necessarily includes the export aspect of *Marquette.*" FHLBB General Counsel Opinion Letter (Aug. 6, 1982).

Significantly, however, while section 501 of DIDA expressly granted the FHLBB the power to issue regulations concerning preemption of state usury laws, the regulations which have resulted reflect the limited preemptive intent of Congress: "Nothing in this section preempts limitation in state laws on prepayment charges, attorneys' fees, *late charges* or other provisions designed to protect borrowers." 12 C.F.R. § 590.3(c) (1989). (emphasis added)

ited Delaware from maintaining laws discriminating against its own state-chartered banks such as Greenwood? [38]

In sum, notwithstanding the scattered suggestions in informal administrative interpretations, *Marquette*'s discussion of the National Bank Act does not teach a general dynamic of ever-expanding preemption or a Congressional strategy of uniform credit regulation which extends irresistibly to displace all state restrictions on state banks. Nor can preemption by necessity be implied logically from *Gavey*, based as it is upon deferential incorporation of FDIC administrative opinions which are themselves contradictory as to the scope of preemption and the breadth of Congressional purpose in enacting DIDA.

### 5. Exportation of Non–Interest Rate Terms.

Even if it were established that Congress intended to establish full parity between

---

**38.** Greenwood's heavy reliance on various informal administrative opinions (also known as informal interpretive rules) raises an important question of the weight to be accorded them here. *See* Greenwood, Exs. A–G.

Federal regulations, as distinguished from informal agency opinions, generally have the same preemptive effect as federal statutes. *Wood v. General Motors Corp.*, 673 F.Supp. 1108, 1114–15 (D.Mass.1987) (citing *Fidelity Federal Savings & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 [1982] ), *rev'd on other grounds*, 865 F.2d 395 (1st Cir.1988). Yet even formal agency regulations "can not exceed the statutory authority by going beyond recognized limits to the congressional mandate." *Alexander v. Trustees of Boston University*, 584 F.Supp. 282, 285 (D.Mass. 1984) (citing *Batterton v. Francis*, 432 U.S. 416, 428, 97 S.Ct. 2399, 2407, 53 L.Ed.2d 448 [1977] ). A court reviewing such regulations must "reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Id.* (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 308, 99 S.Ct. 1705, 1721, 60 L.Ed.2d 208 [1979] ).

Though interpretations of a statute by officers of the agency charged with its administration are entitled to great deference, *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), such "traditional deference ... is not to be applied to alter the clearly expressed intent of Congress". *Board of Governors of Federal Reserve System v. Dimension Financial Corp.*, 474 U.S. 361, 367, 106 S.Ct. 681, 685, 88 L.Ed.2d 691 (1986). Interpretive rulings of an agency administrator " 'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier— and later—pronouncements, and all those factors which give it power to persuade, if lacking power to control'." *General Electric Co. v. Gilbert*, 429 U.S. 125, 141, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 [1944] ). *See Perdue v. Crocker Nat'l Bank*, 702 P.2d at 519.

One benchmark suggested for whether a court properly defers to agency statutory interpretations is whether the interpretation is peculiarly within the expertise of the agency on the one hand, or the court on the other. Breyer, *Administrative Law and Policy*, 274–88 (1985). Under this standard, the technical expertise in monetary and financial matters of the agencies charged with carrying out DIDA is certainly to be respected. On the other hand, Constitutional issues of federalism and preemption are particularly within the court's purview.

Generally, a court has discretion to substitute its *de novo* interpretation for agency interpretive rules. 2 K. Davis, *Administrative Law Treatise*, § 7:8, pp. 36–37; § 7:13, p. 59; 1989 Supp. at 247–48 (2d ed. 1979) (citing cases).

In particular, informal interpretive rules written by staff members are generally accorded less weight than the formal interpretive rulings of an agency administrator. *See* Burke & Kaplinsky at 1098–99 (Agencies such as the FDIC have general interpretive authority under the statutes that were amended by sections 521–23). "It would thus appear that *the interpretations of the agencies themselves, as opposed to the interpretations of their staffs*, should be given the same degree of deference as Federal Home Loan Bank Board interpretations of section 501 of the Act." FHLBB has explicit statutory authority to promulgate regulations to implement section 501. *Compare* 12 C.F.R. § 590.3(c) (1989) discussed in n. 37 above (codified FHLBB *regulation* stating that preemption under section 501 is limited) *with* FHLBB staff counsel's advisory opinion relied upon by *Gavey.*

Thus, though the brief, informal staff administrative opinions proffered by Greenwood are entitled to the Court's careful consideration, they should not be given conclusive effect. This Court must review them in light of the substantial evidence of DIDA's limited preemptive effect and the stated continued Congressional deference given to state consumer protection laws. They should be weighed with all other evidence probative of Congress' intent.

For a criticism of expansive agency interpretations of preemption in this general area, *see generally* James G. Kreissman *Administrative Preemption in Consumer Banking Law*, 73 Va. L.Rev. 911 (1987).

national and state banks and that the Massachusetts opt-out legislation to avoid sweeping preemption was entirely ineffective, the imposition of late charges on Massachusetts credit card customers would still not be assured. The displacement of state law under DIDA's section 521 is limited to "Interest rates" or "the rate allowed by laws of the state," virtually the same language as is found in the National Bank Act. The Commonwealth argues that "rate" refers to numerical periodic interest rates, while Greenwood understands it to be an inclusive term extending to, "all provisions [including late charges] that affect the economic return 'on a loan' to a lender." (Greenwood's Mem.Supp.Summ.J. at 12–13). This point is at the heart of the dispute, and it is here that the law is most unsettled and support for Greenwood most attenuated.

As noted above, neither the plain meaning of the terms "rates" and "interest rates" in section 521 of DIDA and section 85 of the National Bank Act, nor the legislative history of section 521 indicate that these terms carry the expansive meaning inferred by Greenwood. Alternatively, it is argued that an inclusive definition of "rates" is implied by the extension of "most favored lender" status to insured state banks through DIDA and the capacity of such banks to export credit terms through *Marquette.* (Greenwood's Mem. Supp.Summ.J. at 12–16; Greenwood's Mem.Opp'n.Summ.J. at 13–15). But the national bank's authorized exportation of lending terms in *Marquette* (under National Bank Act provisions) like the state bank's exportation in *Gavey Properties* (under DIDA) was, as a factual matter, strictly limited to numerical interest terms.

Greenwood relies on cases arising under the National Bank Act which did *not* involve exportation of terms to establish that " 'the rate allowed by the laws of the State' " is recognized to include, "any charge, fee or expense which affect [sic] the economic return a lender may receive." (Greenwood's Mem.Supp.Summ.J. at 7). The first cited decision, *First Nat'l Bank v. Nowlin,* 509 F.2d 872, 876 (8th Cir.1975), does not offer an expanded definition of

the term "rates," but rather shows only that calculation of chargeable interest rates must take "the case law of the state" into account. Likewise, while the Sixth Circuit in *Northway Lanes v. Hackley Union National Bank & Trust Co.,* 464 F.2d 855, 864 (6th Cir.1972) did allow a national bank operating in Michigan to charge closing costs in conformity to Michigan state law governing state banks, it did not determine whether such charges were "interest" or another aspect of "rates."

Greenwood claims Massachusetts law itself supports a flexible conception of chargeable "rates" under DIDA. It notes the collection of an annual credit card fee is allowed in spite of Massachusetts usury laws because such a fee is not a "finance charge" and "bears no relationship ... to any unpaid balance." *Northampton Nat'l Bank v. Attorney General,* 8 Mass.App.Ct. 809, 812, 397 N.E.2d 1149 (1979) (Grant, J.). Such a ruling is hardly relevant here, however, where Greenwood contends that late charges are collectible precisely because they arise out of or in connection with the lending of money. (Greenwood's Mem. Opp'n.Summ.J. at 2). Reliance on *Rockland–Atlas Nat'l Bank v. Murphy,* 329 Mass. 755, 760, 110 N.E.2d 638 (1953), is likewise misplaced, since that case emphasizes that, "Elimination of all other expenses is an essential and natural part of the legislative scheme for prescribing the allowable rates of interest."

True, some authority supporting a more flexible and inclusive formulation of a chargeable "interest rate" is found in an interpretive ruling of the most favored lender doctrine by the Office of the Comptroller of the Currency ("Comptroller") which provided:

> If State law permits a higher interest rate on a specified class of loans, a national bank making such loans at such higher rate is subject only to the provisions of State law relating to such class of loans that are *material to the determination of the interest rate.*

12 C.F.R. § 7.7310 (1971) (emphasis added).

While the administrative opinions of the Comptroller are persuasive only, they do

provide a useful framework of analysis, one frequently employed by the courts in "rate" determinations.[39] Under this analysis, the question is whether a given provision of Delaware lending law is "material" to determining an interest rate and therefore fully exportable by Greenwood to supplant Massachusetts usury law. A broad interpretation of what is "material" is found in *Equitable Trust Co. v. Sachs*, A–60063/120–1/Fol.713 (Circuit Court of Baltimore City, Md., June 28, 1981 and September 16, 1981), cited in Burke & Kaplinsky, 1106, where the Court allowed a national bank to export an annual credit card fee to a state which prohibited such fees on the ground that the fee was "material" to the determination of "interest" under laws of the bank's home state. This result is unusual, since such fees have not traditionally been considered as "interest" by courts or state legislatures. *See Northampton Nat'l Bank*, 8 Mass.App.Ct. at 813, 397 N.E.2d 1149.

The Comptroller has more recently opined that state law provisions defining the "category" or "classification" of a loan are "material" and therefore "exportable" by a national bank under the National Bank Act. Comptroller Op. Letter no. 178, Fed.Banking L.Rep. (CCH) ¶ 85,259 (Jan. 12, 1981). Late charge provisions would not be material under this analysis since they are not germane to classification of a loan or the computation of numerical interest.

The Commonwealth argues that late charges are functionally distinct from interest since, it says, the imposition or payment of the late charge does not result in Greenwood's forbearance of asserting its right of collection. *See Perry v. Stewart Title Co.*, 756 F.2d 1197, 1207–08 (5th Cir. 1985) (Late charge of 4% on mortgage loan which is merely a bona fide fee for servicing late payments, is "not properly characterized as 'interest'"). Indeed, a Greenwood vice-president recognized this distinction when he testified at his deposition as follows:

> The payment of a late fee per se does nothing to change the decision on whether we would extend further credit or suspend credit privileges, except that it relates to his overall payment pattern on his account. . . .
>
> . . . .
>
> In my mind, finance charge is something that, as a consumer, I would expect to pay for having the privilege of extending my payments over a period of time. If I break my contractual arrangement and default . . . I would expect to either pay a penalty or have the right for someone else to charge me a penalty for the extra cost that they have experienced in trying to enforce their contract with me.

(Stormoen Dep. at 26, 62–63).

In sum, regardless of whether certain finance charges may be exported under *Marquette* and DIDA, the late charges here at issue do not involve the facilitation of credit which undergirds the preemption provision of Title V of DIDA. Rather, they implicate a technical default and breach of the cardholder agreement. Whatever may be the merits of the financial or policy arguments that non-rate provisions are "material" to determination of interest rates, Congress regards late charges such as these in a class apart from interest rates generally.

Thus, whatever the merits of Greenwood's case for untrammeled interstate lending, DIDA preemption does not prohibit Massachusetts from enforcing its statute. Greenwood, in effect, asks this Court to take several unwarranted interpretive leaps to conclude that it has met its burden of establishing preemption. Prior case law under the National Bank Act, the legislative history of DIDA itself, and recent scholarly commentary all demonstrate the

---

**39.** For example, in *Partain v. First Nat'l Bank*, 467 F.2d 167 (5th Cir.1972), the Court considered the Comptroller's rulings and opinions as persuasive on the "materiality" determination but saw *no need to delve into them since it was clear from Supreme Court precedent that com-* pounding was "material" to the determination of an interest rate and thus home state provisions against compound interest made extraterritorial compounding by a national bank a violation of the National Bank Act.

unsettled character of the law in this area generally.

Principles of federalism operate with particular force to preserve traditional spheres of state regulation such as consumer protection through usury laws. The Commonwealth is entitled to enforce its laws absent a clear showing of preemption or interference with interstate commerce. The inclusion of a preemption override provision in DIDA, of which Massachusetts took advantage, underscores the presumption that the Commonwealth's law must be given force here. Greenwood has not met its heavy burden of showing preemption, and the Court declines, itself, to create the sweeping policy of preemption which Congress since 1980 has refused to enact.

### B. *Choice of Law—Delaware or Massachusetts?*

■ Balked at preempting the Massachusetts usury law, Greenwood argues that under applicable conflict of laws rules, Delaware substantive law ought apply. Under generally accepted conflicts rules, the forum state (Massachusetts here) applies its own choice of law rules to determine whether its substantive law or that of another state (Delaware here) governs the issue in question. Restatement (Second) of Conflict of Laws § 187(3) and cmt. h (1989 Supp.). *See, e.g., Bushkin Associates, Inc. v. Raytheon Co.,* 393 Mass. 622, 473 N.E.2d 662 (1985) (Following the general rule of the Restatement, Massachusetts' choice of law rules applied to determine whether Massachusetts or New York law applied to enforce an oral contract).[40] Thus, this Court looks primarily to Massachusetts law to analyze the conflicts issue.

■ In *Bushkin,* the leading Massachusetts conflict of laws case, the Supreme Judicial Court of Massachusetts has provided some general guidance with respect to conflict of law, though it has not addressed the type of issue involved here. Thus, this Court must determine how it believes the Supreme Judicial Court would rule on the question at hand. In *Bushkin,* the court rejected traditional single-factor choice of law doctrine, such as the place of the making of the contract, or the State with the greatest "interest" in the issue, and instead used a broad, "functional" approach that looked to "various choice-influencing considerations." *Id.* at 630–31, 473 N.E.2d 662; *see Travenol Laboratories, Inc. v. Zotal, Ltd.,* 394 Mass. 95, 99, 474 N.E.2d 1070 (1985). *See also Shinberg v. Bruk,* 875 F.2d 973, 975 (1st Cir.1989); *Bi-Rite Enterprises, Inc. v. Bruce Miner Co.,* 757 F.2d 440, 442–43 (1st Cir.1985); *Choate, Hall & Stewart v. SCA Services, Inc.,* 378 Mass. 535, 540–41, 392 N.E.2d 1045 (1979).[41] For guidance, the court in *Bushkin* looked to the general choice of law principles set forth in section 6 of the Restatement (Second) of Conflict of Laws

---

**40.** Under *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), a federal court in diversity applies the choice of law rules of the state in which it sits, since conflicts issues are matters of state law. Though the primary basis for the Court's jurisdiction here is federal question (to determine the scope of federal preemption under DIDA), the case was also brought pursuant to this Court's diversity jurisdiction. Thus, *Klaxon* governs the choice of law issue here, and the Court properly looks to the conflicts law of the forum, Massachusetts.

Further, "[b]ecause the Supreme Court has declined to determine the reach of the states' legislative jurisdiction in conflict-of-law situations, the definition of the boundaries has been left to state conflicts rules." Richard J. Bauerfield, Note, *Effectiveness of Choice-of-Law Clauses in Contract Conflicts of Law: Party Autonomy or Objective Determination,* 82 Colum.L.Rev. 1659, 1664 (1982). *But see Allstate Ins. Co. v.*

*Hague,* 449 U.S. 302, 307–13, 101 S.Ct. 633, 637–40, 66 L.Ed.2d 521 (1981), *reh. denied,* 450 U.S. 971, 101 S.Ct. 1494, 67 L.Ed.2d 623 (1981).

**41.** As *Bushkin* noted, "[a]most all states have abandoned the lex loci rule." *Bushkin,* 393 Mass. at 630–31, 473 N.E.2d 662. Implicit in this statement is a rejection as outdated of the reasoning in *Seeman v. Philadelphia Warehouse Co.,* 274 U.S. 403, 407, 47 S.Ct. 626, 627, 71 L.Ed. 1123 (1927), which held that a contract for interest exceeding another state's usury limit was enforceable if the state where the contract was made permitted it. Thus, even assuming that the Cardmember Agreement here was made in Delaware, that fact cannot be dispositive as to whether Delaware or Massachusetts substantive contract law applies to an issue of usury. Indeed, Greenwood does not insist that Delaware law must be applied solely on the ground that the Agreement was made in that State.

(1971) and to R.A. Leflar, *American Conflicts Law* (3d ed. 1977).[42]

The issue in *Bushkin* was whether the Massachusetts or the New York Statute of Frauds should be applied to an alleged oral agreement between two parties where such an agreement was barred under the New York statute, but not under the Massachusetts statute. Unlike the case at hand, however, the parties in *Bushkin* were business entities engaged in a commercial contract who had not specified a choice of law therein. These crucial factual differences limit the precedential effect of *Bushkin* to its multi-factor analysis.

The issue here is rather whether Massachusetts law applies to prohibit Greenwood from enforcing the late charge provisions of the Discover Cardmember Agreement, notwithstanding the choice of law provision of the Agreement. That provision specifies that the Agreement "will be governed by the laws of the State of Delaware and applicable federal laws." Under the Delaware statute, a credit card issuer located in Delaware may contract with cardmembers to charge any agreed-to interest rate, plus late payment fees on unpaid balances. Del.Code Ann. tit. 5, §§ 943, 950 (1990).

Emphasizing the disparity in bargaining power between Greenwood—the Discover Card colossus—and a credit card applicant, the Commonwealth maintains that "Massachusetts will not enforce a contractual choice of law clause where it is one of the 'boiler plate' terms in an adhesion contract between parties of disparate bargaining power." (Commonwealth's Mem. Opp'n.Summ.J. at 15). It cites *Ernest & Norman Hart Bros., Inc. v. Town Contractors, Inc.*, 18 Mass.App.Ct. 60, 463 N.E.2d 355, *review den.* 392 Mass. 1103,

465 N.E.2d 262 (1984), and *In re Maxcy*, 45 B.R. 268, 270 (Bankr.D.Mass.1985) for this proposition, but neither of those cases clearly establish that adhesion contracts are per se unenforceable under Massachusetts law. In *Ernest*, a contract between a Massachusetts subcontractor and a Connecticut subcontractor contained both a choice of forum clause that "Connecticut law shall have jurisdiction in disputes between the parties" and a choice of law clause that "[t]he law of the place of the building (Massachusetts) shall govern." *Id.* at 62, 463 N.E.2d 355. The court treated the first clause as one for forum selection and refused to enforce it primarily on waiver grounds, although it also noted that the contract was one of adhesion. *Id.* at 66–68. The Massachusetts Appeals Court recognized, however, that the modern view holds forum selection clauses generally enforceable, citing *Fireman's Fund American Ins. Co. v. Puerto Rican Forwarding Co.*, 492 F.2d 1294, 1296–97 (1st Cir.1974). *Ernest* at 64–65, 463 N.E.2d 355.[43] In *Maxcy*, the Bankruptcy court refused to enforce a contract primarily on a ground other than adhesion, though it used adhesion as an alternative basis for its holding. The Bankruptcy judge simply asserted that adhesion contracts are unenforceable, however; he engaged in no analysis of Massachusetts law. This Court finds these decisions unpersuasive.

█ Contrary to the Commonwealth's assertions, the law in Massachusetts is that generally a court will not deny enforcement of a contract of adhesion unless it is unconscionable or in some other way fundamentally unfair. *See Santos v. Lumbermen's Mutual Casualty Co.*, 408 Mass. 70, 86, 556 N.E.2d 983 (1990); *Lechmere Tire*

---

**42.** Section 6(1) of the Restatement states that "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Massachusetts' general conflict of laws statute permits parties contractually to agree that the law of either Massachusetts or another state shall govern, "when a transaction bears a reasonable relation to this state and also to another state ..." Mass.Gen.L. ch. 106 §§ 1–105(1); *Massengale v. Transitron Elec. Corp.*, 385 F.2d 83, 86 (1st Cir., 1967). The parties here do not appear to dispute that the Cardmember Agreement bears a *reasonable* relation-

ship to *both* Delaware and Massachusetts; the question is which state's law should prevail.

**43.** *See M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10–11, 92 S.Ct. 1907, 1913–14, 32 L.Ed.2d 513 (1972); *Allstate Insurance Co. v. Hague*, 449 U.S. 302, 324, n. 11, 101 S.Ct. 633, 646, n. 11, 66 L.Ed.2d 521 (1981) (Choice of law analysis applies where there is no forum selection clause; the "justifiable expectations" of contracting parties remain a major concern).

*& Sales Co. v. Burwick,* 360 Mass. 718, 720–21, 277 N.E.2d 503 (1972).[44]

This is the approach of the Restatement (Second) of Conflict of Laws (1989 Supp.), which Massachusetts decisions follow without exception since *Bushkin.* Under the Restatement, a contract of adhesion is enforceable unless the consent of the adherent was "obtained by improper means, such as by misrepresentation, duress, undue influence, or by mistake." Restatement, § 187 cmt. b. There is no such evidence here. True, section 187 of the Restatement permits a Court to consider, as one factor, whether a choice of law provision is found in an adhesion contract, "namely one that is drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms." Restatement, § 187 cmt. b. Though "[c]hoice-of-law provisions contained in such contracts are usually respected ... the forum will scrutinize such contracts with care and will refuse to apply any choice-of-law provision they may contain if to do so would result in substantial injustice to the adherent." *Id.*

■ Here, while the Cardmember Agreement is a contract of adhesion, its provision for late charges is neither unconscionable nor does it result in substantial injustice to the adherent. What's more, in view of the protection of the Commonwealth's consumer disclosure statute, Mass.Gen.L. ch. 140, § 114C, the Court rules that the consent of the cardholders to such charges was not obtained by improper means.

Here, the choice of law provision unmistakably directs the parties to the law of Delaware. Still, analysis cannot end at this point. Under section 187(2) of the Restatement, The law of the state chosen by the parties to govern their contractual rights and duties will be applied ... unless ...

(b) application of the law of the chosen state would be contrary to a fundamental

policy of a state which has a materially greater interest than the chosen state in determination of the particular issue and which, under the rule of § 188, would be state of the applicable law in the absence of an effective choice by the parties.

Under the Restatement, "[the] forum will apply its own legal principles in determining whether a given policy is a fundamental one within the meaning of the present rule and whether the other state has a materially greater interest than the state of the chosen law in the determination of the particular issue." Restatement § 187, cmt. g. *See Kronovet v. Lipchin,* 288 Md. 30, 415 A.2d 1096, 1105 (1980) (citing § 187). Thus, under section 187, a key consideration is whether the Commonwealth's usury statute, particularly its prohibition of late charges, amounts to a fundamental policy which it has a materially greater interest in enforcing than the policy by which Delaware permits a bank located in that state to assess late charges as interest.

■ The Commonwealth claims that under section 187(b) of the Restatement the Massachusetts usury statute itself expresses the "fundamental policy" of Massachusetts, a policy which outweighs Delaware's interest in permitting its banks to assess late charges in foreign states. This Court agrees.

Not every statutory enactment expresses a fundamental policy. "On the other hand, a fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power." Restatement § 187, cmt. g. *See, e.g., Business Incentives Co. v. Sony Corp. of America,* 397 F.Supp. 63, 67 (S.D.N.Y.1975) (Despite agreement that New York Law apply, New Jersey has a strong public policy to protect relatively powerless consumer or small businessperson from more powerful commercial giants); *O'Brien v. Shearson Hay-*

**44.** *But see* Edith Fine, *Massachusetts Contract Cases and Choice of Law,* 43 Mass.L.Q. 46, 48–49 (1958) (Citing older Massachusetts cases in which choice of law provisions in insurance contracts were disregarded, apparently on the ground that they constituted adhesion contracts).

*den Stone, Inc.*, 90 Wash.2d 680, 586 P.2d 830, 833–34 (1978), *on recons.*, 93 Wash.2d 51, 605 P.2d 779, 780–83 (1980) (Disregarding a choice of law provision in a broker's contract and holding that the state of Washington has a materially greater interest in protecting its consumer-citizens than New York has in charging interest to Washington citizens); *North American Bank, Ltd. v. Schulman*, 123 Misc.2d 516, 474 N.Y.S.2d 383, 386–87 (Co.Ct.1984) (Foreign law chosen permitted usury against a fundamental policy of the forum); *Whitaker v. Spiegel, Inc.*, 623 P.2d 1147, 1153–54 (Wash.1981), *app. dismd. Spiegel, Inc. v. Whittaker*, 454 U.S. 958, 102 S.Ct. 496, 70 L.Ed.2d 374 (1981). *Turner v. Aldens, Inc.*, 179 N.J.Super. 596, 433 A.2d 439, 442–44 (1981) (Usury provision of New Jersey Retail Installment Sales Act applied to out-of-state creditors despite silence of statute and choice of law clause to the contrary in an adhesion contract, in view of the evil legislature sought to remedy).

In light of the significant body of authority on this point and the evident concern of Massachusetts with the protection of its consumers generally, and through its usury statute in particular, this Court rules that Massachusetts law applies in the premises notwithstanding the contrary choice of law provision.

### C. *The Reach of Massachusetts Usury Restrictions Under Mass.Gen.L. ch. 140, § 114B*

■ Greenwood has one last arrow in its quiver. It lets fly with the brief contention which it touched on in oral argument that Mass.Gen.L. ch. 140, § 114B does not prohibit Greenwood's conduct here. The parties have examined the express terms of section 114B and dispute whether its prohibition on late charges applies to unmentioned out-of-state lenders, such as Greenwood.

As discussed above, in 1981 Massachusetts joined a number of States which, in response to national bank deregulation and tightened local credit, substantially amended their usury statutes to preserve the competitive position of state-chartered financial institutions.[45] Among other measures, Massachusetts raised its usury limit from 12% to 18% on open end credit accounts, a category which includes credit cards. Mass.Stat.1981, ch. 384, § 1, amending Mass.Gen.L. ch. 140, § 114B.[46] This same statutory amendment also provides: "No creditor shall impose a delinquency charge, late charge, or similar charge on loans made pursuant to such an open end credit plan."

The Commonwealth argues that Greenwood is prohibited by these express terms from imposing on Massachusetts customers the late charge provision in Greenwood's Cardmember Agreement. That Agreement is also challenged as unlawful for imposing "unfair multiple payments for single defaults" since "notwithstanding the late charge, a credit card lender continues to charge and accrue interest on all delinquent accounts."[47] This is said to constitute double-charging in excess of the 18% usury limit on open-end credit card accounts.

The Massachusetts statute, section 114B, is silent as to whether its late charge prohibition reaches out-of-state creditors. The Commonwealth argues that, since the reach of the statute is not by its terms restricted, it must extend to all creditors, in and out of state. It contends, "[t]he contrary interpretation requires the conclusion that the Legislature sought to prohibit late fees but failed to enact a statute which achieved this purpose for many Massachusetts consumers." Commonwealth's Reply at 12. This is hardly the Commonwealth's strongest argument and Greenwood at

---

**45.** *See, e.g., Usury Lending Limits Hearings.*

**46.** *See* Mass.Stat.1984, ch. 489, § 1 for a subsequent amendment not here relevant. *See* note 17, *supra.*

**47.** Commonwealth's Mem.Sup.Summ.J. at 10 n. 7. The Commonwealth makes this argument in

the context of a complex technical discussion of the preemption issue, specifically case law interpreting the National Bank Act and the historical relationship between interest rates and noninterest charges, such as late payment fees. The intricacies of that discussion are not relevant to the legislative interpretation required here.

once counters that, because the provisions of another consumer statute in Massachusetts, Mass.Gen.L. ch. 255D, § 1, do expressly contemplate extraterritorial reach, the silence of section 114B indicates legislative intent that it not have the same effect or, at a minimum, demonstrates an ambiguity that requires resort to the legislative history of the crucial amendment to § 114B—Mass.Stat.1981, ch. 384. Greenwood's Mem.Sup.Summ.J. at 15–16.[48]

This Court has pursued this last line of inquiry, finding that the preponderance of available evidence indicates that the Massachusetts sponsors and supporters of section 114B, not unlike the Congressional sponsors of section 521 of DIDA, were primarily preoccupied with raising the numerical interest rate ceiling for *Massachusetts*-chartered banks so that they could compete effectively with other banks.

While Massachusetts legislative history is notoriously sparse, the record of debate and discussion concerning Mass.Stat.1981, ch. 384 does exist, albeit in unofficial form.[49] The minutes of the Massachusetts Senate floor debate concerning the bill that became Mass.Stat.1981, ch. 384, while limited, do shed considerable light on the purposes of the statute.[50]

The record of the enacting legislative session indicates that the fundamental purpose of Mass.Stat.1981, ch. 384, § 1 was to *raise* the ceiling on finance charges Massachusetts-based credit card issuers could impose on open end credit accounts, in an attempt to dissuade such issuers from moving their operations out of state.[51]

As sponsor of the bill which ultimately became Chapter 384, Senator John A. Brennan proposed the legislation as a compromise between those on the one hand who wanted no interest rate higher than the then-applicable 12%, and the banking industry on the other which argued for total deregulation.[52] Senator Brennan argued

**48.** Chapter 255D of the Massachusetts General Laws, enacted as part of Massachusetts' earliest consumer protection legislation in 1966, covers retail installment sales agreements (generally treated as purchase money security interests), as well as revolving credit agreements, such as department store credit agreements which contemplate repeated transactions and a revolving balance on finance charges. *See, e.g.*, Herbert P. Wilkins, *Revolving Credit Agreement, Retail Installment Sales*, 51 Mass.L.Q. 233 (1966). Section One of chapter 255D excludes from the definitions of both types of agreements "an agreement signed by a nonresident buyer in the commonwealth if the buyer has agreed that the law of his state shall apply." This provision does not support Greenwood, since it merely declines to extend Massachusetts' law to consumers who happened to reside in other states.

**49.** In Massachusetts, the official Senate and House Journals contain only a record of action taken but no summary of debate. Similarly, there are no formal transcripts of Committee hearings. However, since the early 1970's, a news bureau, the State House News Service ("SHNS"), provides in the form of press releases unofficial records of action and selective debate from many, though not all, daily legislative sessions. Fortunately, SHNS recorded coverage of the floor debate of the bill that became Mass. Stat.1981, ch. 384. In the absence of an official record, the SHNS releases are parsed here.

**50.** SHNS, May 26, 1981, pp. 2–3; May 27, 1981, pp. 2–6.

**51.** Chapter 384 went into effect just prior to the effective date of the Massachusetts legislature's override of the federal preemption provisions of DIDA, though the legislature had acted to override DIDA before enacting the 1981 amendment to the usury law. The preemption override, approved June 4, 1981, became effective on September 4, 1981. Mass.Stat.1981 ch. 231, "An Act Exempting the Commonwealth From the Usury Preemption Provisions of the Nineteen Hundred and Eighty Deregulation and Monetary Control Act." The amended usury statute, Chapter 384, was approved August 6, 1981 and became effective by emergency declaration of the Governor on August 19, 1981. Mass.Stat.1981, ch. 384.

Section 2 of Chapter 384 for the first time regulated charge card agreements. That section was codified as Mass.Gen.L. ch. 255, § 12H. Under section 12H charge card agreements contemplate no periodic finance charge but rather payment in full upon receipt of a monthly billing. Mass.Stat.1981 ch. 384, § 2, codified as Mass.Gen.L. ch. 255, § 12H.

**52.** SHNS, May 26, 1981, p. 2. While the banking industry wanted total deregulation (*See, e.g.*, 1981 House J., H–1233, deregulating finance charges on open end credit plans and providing for "[annual percentage rate] not in excess of that agreed upon by creditor and customer"), Senator Jack Backman charged that the Brennan amendment was overindulgent to the banks. *Id.* Senator John Parker, on the other hand, thought the amendment was "trying to take care of delinquent card holders." *Id.* at 4. Senator Brennan argued that his proposal was

that some increase in the interest rate was necessary to forestall the flight of banks from Massachusetts to other states where higher interest rates were permitted:

> Brennan continued saying a number of states do not restrict banks from marketing cards in Massachusetts. In state customers are being charged 19 or 20 percent he said, because other states do not restrict issuers. Brennan claimed the realities of the situation are that many in state issuers will begin to move out of state if they can find unlimited interest rates. Brennan said state banks originally wanted unlimited rates in Massachusetts, but the Banks and Banking Committee worked up this compromise and agreed to put the limit up to 18%.

SHNS, May 27, 1981, p. 5.

More significant, Senator Brennan pleaded for action on his compromise on the ground that, if Massachusetts lenders moved their operations to states with less restrictive laws, Massachusetts would be unable to control the charges banks in those states could impose on its residents:

> Senator Brennan said the U.S. Supreme Court decided that the National Banking Act precludes state regulators from regulating banks chartered to do business in another State. He said he hopes the bill is not recommitted.

*Id.* at 5. The Brennan amendment was then adopted. *Id.* at 6.

It is a compelling inference that Senator Brennan was referring to the 1978 *Marquette* decision. It thus appears clear that the chief sponsor of the statute increasing the usury limit thought out-of-state banks beyond its reach.

---

"a compromise. It serves both banks and consumers." *Id.*

**53.** The Court notes that prior to the passage of the Brennan amendment, the Massachusetts Senate in 1981 authorized a study of the impact of late charges specifically upon the availability of consumer credit and upon lenders. S. 20, proposed by Senator Robert Buell, an opponent of the Brennan amendment, provided:

> Resolved that the Joint Committee on Banks and Banking is authorized to investigate interest rates on credit cards, fees attached thereto, and consider the matter of free periods, imposition of late charges and delinquency charges

The record points to the overriding concern of the Massachusetts legislature: *viz.* to provide Massachusetts banks with interest rates *closer* to those which banks could obtain in some other states, yet to cap those rates at 18%. There appears to have been *no discussion about precluding out-of-state banks from charging higher rates or imposing late charges on Massachusetts residents.* Chapter 384, instead, was enacted to keep Massachusetts-based banks in Massachusetts while continuing to protect consumers through limitations on rates and charges. There is no direct evidence that the Massachusetts legislature ever considered the possibility that it might possess the authority to impose the terms of section 114B on out-of-state banks.[53] The evil sought to be addressed by this legislation was the potential exodus of Massachusetts card-issuing banks to other states.

This is not to suggest that the Massachusetts Legislature was unconcerned about late charges or that the prohibition on late charges was unthinking surplusage. The record of enactment of Chapter 384 indicates legislative concern that either a charge card issuer or a card issuer pursuant to an open end credit account could, by imposing late charges upon a borrower's failure to make payments due in full, exceed the 18% usury limit established in the Act.

Senator Brennan expressed particular concern over the announced intention of American Express to impose late fees of 2.5% on balances due over 60 days on its charge card customers, or 25% per annum. SHNS, May 26, 1981, p. 2; May 27, 1981, p. 5. Sen. Brennan claimed that though his

---

and all other matters pertaining to credit cards. The Committee shall report the results of such study, if any, and drafts by June 30, 1981.

S. 20.

The Court has been unable to determine whether the S. 20–authorized study was actually carried out; at least the Court has discovered no published version. Such a study might enlighten the Court as to the significance of late charges generally, though it seems extremely doubtful that such a study, if it existed, would point to a contrary result here.

amendment would raise interest rates by 6%, it would save Massachusetts consumers 7% by capping rates at 18%. *Id.*, May 27, 1981, p. 5.

These same concerns are echoed in a joint resolution of the legislature with an accompanying news release prepared in October of 1981 (*after* passage of section 114B). There, Massachusetts legislators described the banking statutes recently enacted during the 1981 legislative session (including section 114B) as indicating the Commonwealth's "... desire to retain control of its interest rate statutes by overriding Title V [of DIDA]"; and called for rejection of proposed Congressional bills (S–1406 and HR–2501) [54] which would "preempt state laws expressly limiting the nature, rate, amount of or manner in which interest finance charges or other fees may be charged." SHNS, October 6, 1981. Representative Antoine Aguiar, Chairman of the Massachusetts Joint Committee on Banks and Banking, was outspoken in opposition to the additional preemption bills or the weakening of Massachusetts usury laws, declaring:

> The money lenders are now seeking the wholesale repeal of state usury laws.... In addition to giving money lenders nation-wide carte blanche to follow the lead of these [deregulating] states [e.g. Delaware], the [proposed] federal legislation also eliminates all prohibition on fees imposed by lenders.... These are the notorious hidden charges that we have fought for years to eliminate.... Consumers will no longer be able to comparison shop if federal preemption occurs.

SHNS, October 26, 1981.

The Legislature's joint resolution against further preemption and Senator Aguiar's opposition to weakening state restrictions on "hidden charges" presumably includes protection against late charges. These declarations thus imply that Massachusetts legislators believed their newly enacted usury reforms (including section 114B) effectively protected Massachusetts citizens against the deregulated lending practices allowed in states like Delaware or proposed in preemption legislation then before Congress.

The after-the-fact rationalizations for legislative action provide, however, no sure footing for analysis and are widely considered unreliable as a source of legislative interpretation. *See United States v. Wise*, 370 U.S. 405, 411, 82 S.Ct. 1354, 1358–59, 8 L.Ed.2d 590 (1962); *Bobsee Corp. v. United States*, 411 F.2d 231, 237 n. 18 (5th Cir. 1969); *Chugach Natives, Inc. v. Doyon, Ltd.* 588 F.2d 723, 731 (9th Cir.1978). *See also* R. Dickerson, Interpretation and Application of Statutes, 179–80 (1975); Sutherland, *Statutory Construction*, § 49.11 at 414–15 (4th ed. 1984). Greenwood argues that there are other more reliable indicia which support the conclusion that section 114B was never intended to apply to out-of-state lenders.

First, Greenwood argues that Massachusetts policy with respect to late charges cannot be a fundamental legislative goal since other consumer statutes in the Commonwealth either permit late charges or allow interest rates higher than the 18% cap found in section 114B (*e.g.*, retail installment sales agreements and charge card accounts). As to late charges, this argument ignores the fact that no finance charge is assessed on charge card accounts at all. Further, higher rates of interest under retail credit agreements typically are not prohibited by state usury statutes, since the merchant is primarily in the business of selling goods or services, not loaning money. *See* Curran, *Legislative Controls as a Response to Consumer–Credit Problems*, 8 B.C.L.Rev. 409, 413–415 (1967). Thus, Greenwood's argument in this respect is unpersuasive.

Second, Greenwood notes that the provisions of a related Massachusetts consumer protection statute, Mass.Gen.L. ch. 140, § 114C, enacted in 1987 by Mass.Stat.1987, ch. 595, required out-of-state issuers of credit cards to disclose to customers any rates or charges imposed above the Massachusetts limits, and ordered state agencies to educate local consumers as to compara-

---

**54.** *See, C.I.S., Annual Abstract,* 1981, S–241–46, pp. 666–67.

tive rates and charges for both in-state and out-of-state banks.[55] Section 114C did not, however, directly prohibit such elevated charges and rates by foreign lenders.

Greenwood stresses that since section 114C contained express terms making it applicable to out-of-state issuers of credit cards, in contrast to the silence of section 114B in that regard, by implication section 114B was not intended to apply to out-of-state creditors. Section 114C, however, was passed six years after section 114B, and therefore it cannot shed light on the legislative intent of the earlier statute. *See, e.g. Andrus v. Shell Oil Co.*, 446 U.S. 657, 666 n. 8, 100 S.Ct. 1932, 1938 n. 8, 64 L.Ed.2d 593 (1980) ("[A]rguments predicated upon subsequent Congressional actions must be weighted with extreme care [but] not rejected out of hand"); *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596, 100 S.Ct. 800, 813–14, 63 L.Ed.2d 36 (1980) (Subsequent enactments and statements of Congress regarding restrictions on subsidized national flag vessels "cannot override the unmistakable intent" of the enacting Congress). Nor is it clear, logically, that section 114C supports Greenwood's statutory construction of section 114B's territorial reach, since section 114C, unlike section 114B which expressly restricts late charges, just as expressly countenances an annual fee.[56] On its face, section 114C expresses a nondiscriminatory intent to treat out-of-state credit card issuers similarly to their in-state counterparts. The enactment of section 114C, therefor, sheds little light on the interpretation to be afforded to section 114B.

Greenwood's conclusion that section 114B was not intended to reach beyond Massachusetts' borders is buttressed, however, by the fact that the Commonwealth has presented no evidence of any previous attempts to enforce section 114B in such a way as to reach either interest rates or late charges imposed by out of state banks upon Massachusetts residents. Indeed, during the eight years prior to the filing of the present suit, out-of-state banks routinely charged interest rates to Massachusetts residents higher than the 18% cap permitted to Massachusetts banks.[57]

This, of course, is precisely the result one would expect following the *Marquette* decision with respect to out-of-state national banks. The evidence before the Court thus proves little more than that the Massachusetts banking authorities are complying with the National Bank Act as interpreted in *Marquette*. Such evidence cannot be boot-strapped into a contemporaneous regulatory construction of an allegedly ambiguous statute.

For, in the final analysis, Mass.Gen.L. ch. 140, § 114B is not ambiguous. While the Court has extended this opinion to analyze

---

**55.** Section 114C also provides that a card issuer "whether located within or without the commonwealth, may assess an annual fee," subject to certain requirements for creditor notice and consumer entitlement to cancellation and refund *without penalty*.

**56.** It will be remembered that the Massachusetts Appeals Court had previously held that a national bank located in Massachusetts could assess an annual fee in addition to the maximum allowable finance charge, interpreting such fees as independent of the method of calculating finance charges. *Northampton Nat. Bank v. Attorney General*, 8 Mass.App.Ct. 809, 397 N.E.2d 1149 (1979).

**57.** *See* Office of Commissioner of Banks, Quarterly Credit Card Issuer's Report, June 30, 1990. The official quarterly reports issued by the Commissioner are expressly required by the Massachusetts credit card disclosure statute. Mass. Gen.L. ch. 140, § 114C. The most recent 23-page report lists several hundred in state and out of state credit card issuers and clearly illustrates the slight percentage differential in interest rates charged by in state and out-of-state banks to Massachusetts cardholders. The report does not list Greenwood Trust Company.

The report includes data with respect to annual percentage rates, grace periods, annual fees, and "other fees." Other fees are not further delineated. However, the Court notes that the underlying data form sent to credit card issuers in and out of the Commonwealth requests each issuer to list "Amounts of fees charged (if any)," and then includes spaces for annual fee, cash advance fee, late charge, over limit fee, and any other fees. The form may be obtained from the Office of the Commissioner of Banks.

The Office also publishes a quarterly newsletter which summarizes the results of the Card Issuer's Report and gives general advice to consumers to consider the relative advantages and disadvantages of each card issuer's terms.

each of Greenwood's contentions, that analysis—undertaken out of an excess of caution in light of the importance of the issue presented—ultimately adds nothing to the plain language of the statute. The Massachusetts legislature has simply and unequivocally barred credit card late charges. There is, upon reflection, no occasion to go behind the plain language to speculate upon the policy motives behind this legislative mandate. Enough said.

## IV. CONCLUSION

For all the foregoing reasons, the Court holds 1.) that the provisions of DIDA do not preempt the Massachusetts usury law; 2.) Massachusetts, not Delaware, law applies in the premises; and 3.) the prohibition on credit card late charges reaches out-of-state credit card issuers such as Greenwood.

Accordingly, Greenwood's motion for summary judgment is DENIED, and that of the Commonwealth is ALLOWED. As there is thus no occasion to consider the damages issue, judgment shall enter for the Commonwealth and its Attorney General. The parties shall submit a proposed form of judgment.