USCA1 Opinion

 

 October 26, 1992 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ Nos. 91-2205 92-1065 92-1150 GREENWOOD TRUST COMPANY, Plaintiff, Appellant, v. COMMONWEALTH OF MASSACHUSETTS, ET AL., Defendants, Appellees. _________________________ ERRATA SHEET ERRATA SHEET The opinion of the Court issued on August 6, 1992, is corrected as follows: On page 6, line 6 insert . . . after "bank[s]" On page 9, footnote 4, line 7 change "Title V" to "Title IV" On page 26, line 17 change "1987" to "1986"August 6, 1992 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ Nos. 91-2205 92-1065 92-1150 GREENWOOD TRUST COMPANY, Plaintiff, Appellant, v. COMMONWEALTH OF MASSACHUSETTS, ET AL., Defendants, Appellees. _________________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Lay,* Senior Circuit Judge, ____________________ and Pieras,** District Judge. ______________ _________________________ Arthur R. Miller, with whom Andrew F. Lane, Gilbert R. Hoy, _________________ ______________ _______________ Jr., Warner & Stackpole, Burt M. Rublin, Wolf, Block, Schorr and ___ __________________ ______________ _______________________ Solis-Cohen, Alan R. Feldman, and Sullivan & Worcester were on ___________ ________________ ____________________ brief, for appellant. Ernest L. Sarason, Jr. and William T. Matlack, Assistant ________________________ ___________________ Attorneys General, with whom Scott Harshbarger, Attorney General, _________________ and Sarah Wald, Special Assistant Attorney General, were on ___________ brief, for appellees. Frank Max Salinger and Robert E. McKew on brief for American __________________ _______________ Financial Services Association, amicus curiae. Arnold M. Lerman, Christopher R. Lipsett, John B. Bellinger, ________________ ______________________ __________________ III, Kenneth L. Chernof, and Wilmer, Cutler & Pickering on brief ___ __________________ __________________________ for Bank of America, et al., amici curiae. John J. Gill, Michael F. Crotty, and Irving D. Warden on ____________ __________________ _________________ brief for American Bankers Association, amicus curiae. Ralph J. Rohner, Marcia Z. Sullivan, and Steven I. Zeisel on _______________ __________________ ________________ brief for Consumer Bankers Association, amicus curiae. L. Richard Fischer, Robert M. Kurucza, Steven S. Rosenthal, __________________ __________________ ___________________ James A. Huizinga, and Morrison & Foerster on brief for Visa __________________ ____________________ U.S.A., Inc. and Mastercard International Incorporated, amici curiae. Alfred J.T. Byrne, General Counsel, Douglas H. Jones, Senior _________________ ________________ Deputy General Counsel, Thomas A. Schulz, Assistant General _________________ Counsel, Colleen B. Bombardier, Senior Counsel, and Lisa M. ______________________ ________ Miller, Counsel, on brief for Federal Deposit Insurance ______ Corporation, amicus curiae. Marsha Kramarck, Deputy Attorney General, on brief for ________________ Delaware State Bank Commissioner, amicus curiae. Richard P. Eckman, Daniel I. Prywes, Joseph L. Lakshmanan, __________________ ________________ ____________________ and Pepper, Hamilton & Scheetz on brief for Delaware Bankers ____________________________ Association, amicus curiae. Lee Fisher, Attorney General (Ohio) and Kathleen McDonald ___________ _________________ O'Malley, Chief Counsel, Office of Attorney General, on brief for ________ States of Ohio, Arizona, Illinois, Louisiana, Nevada, South Dakota and Utah, amici curiae. Bonnie J. Campbell, Attorney General (Iowa), and Peter R. ___________________ ________ Kochenburger, Assistant Attorney General, on brief for States of ____________ Arkansas, Colorado, Connecticut, Hawaii, Idaho, Iowa, Kansas, Kentucky, Maine, Minnesota, New Jersey, North Carolina, Pennsylvania, Rhode Island, South Carolina, Texas, Vermont, West Virginia and the District of Columbia, amici curiae. Michael M. Malakoff, Ellen Doyle, Malakoff, Doyle & Finberg, ___________________ ___________ _________________________ Nicholas E. Chimicles, Michael D. Donovan, Robin Resnick and ______________________ ___________________ _____________ Greenfield & Chimicles on brief for Bankcard Holders of America, ______________________ et al., amici curiae. James C. Sturdevant, Kim E. Card, Sturdevant & Sturdevant, ____________________ ___________ _______________________ and Gail Hillebrand on brief for Consumer Action and Consumers _______________ Union, amici curiae. Albert Endsley, Steven W. Hamm, and Philip S. Porter on _______________ _______________ _________________ brief for National Association of Consumer Credit Administrators and American Conference of Uniform Consumer Credit Code States, amici curiae. _________________________ _________________________ ________________ *Of the Eighth Circuit, sitting by designation. **Of the District of Puerto Rico, sitting by designation. SELYA, Circuit Judge. This train wreck of a case SELYA, Circuit Judge. ______________ arises out of a headlong collision between a state consumer- protection law and a federal banking law. It brings into sharp focus the tensions inherent in our federalist system while presenting a novel legal question: can a federally insured bank, chartered in Delaware, charge its Massachusetts credit-card customers a late fee on delinquent accounts, notwithstanding a Massachusetts statute explicitly prohibiting the practice? The district court answered this question in the negative, enforcing the state statute and granting partial summary judgment in appellees' favor. Because we believe that the lower court was on the wrong track, we reverse. Federal law has the right of way in this area. I. I. __ Background Background __________ The pertinent facts are largely undisputed. Plaintiff- appellant Greenwood Trust Company (Greenwood) is a Delaware banking corporation. Its deposits are insured by the Federal Deposit Insurance Corporation. Through a wholly owned subsidiary, Greenwood offers an open end credit card the Discover Card to customers nationwide. More than one hundred thousand of its cardholders live in Massachusetts. The terms and conditions applicable to use of the Discover Card are spelled out in a Cardmember Agreement. The Agreement stipulates, inter alia, that the holder must make a _____ ____ minimum monthly payment, calculated by reference to the credit- 4 card balance outstanding from time to time, on or before a designated due date. Failure to make this payment in a timeous fashion constitutes a default. If the default is not cured within twenty days, a ten-dollar late charge is automatically assessed. On October 27, 1989, the Commonwealth of Massachusetts advised Greenwood that its imposition of late charges under such circumstances contravened state law. The Commonwealth threatened to take legal action. Greenwood promptly launched a preemptive strike, filing a complaint for declaratory and injunctive relief in the United States District Court for the District of Massachusetts.1 The Commonwealth denied that federal law preempted the Massachusetts statute. It also counterclaimed, seeking to bar Greenwood from assessing late charges and to collect restitutionary damages, together with civil penalties, referable to Greenwood's defiance of state law. The district court adjudicated the parties' competing claims on cross-motions for summary judgment. Discerning no federal preemption, the court ruled that Massachusetts law applied. Since the court interpreted that law to forbid Greenwood's imposition of late charges upon cardholders who lived in Massachusetts, it denied Greenwood's motion and granted partial summary judgment in the Commonwealth's favor. Greenwood _________ ____________________ 1Greenwood's suit invoked the Supremacy Clause of the federal Constitution. The Commonwealth and its Attorney General were named as defendants. For simplicity's sake we refer to both defendants as "the Commonwealth." 5 Trust Co. v. Massachusetts, 776 F. Supp. 21 (D. Mass. 1991). The _________ _____________ district court certified its rulings for interlocutory appeal under 28 U.S.C. 1292(b) (1988). In light of the pivotal importance and broad commercial consequence of the questions presented, we accepted the certification. (As an aside, we remark that our belief as to the importance of the questions presented has been validated to some degree by the outpouring of amicus briefs, some favoring appellant's position and some opposing it.) These appeals ensued.2 II. II. ___ The Statutory Scheme The Statutory Scheme ____________________ Two statutes lay at the heart of the dispute between these protagonists: the state law that prohibits the imposition of late fees by credit-card issuers, viz., Mass. Gen. L. ch. 140, 114B (1991) (Section 114B), and the federal law which arguably preempts the state statute, viz., Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDA), Pub. L. No. 96-221, 94 Stat. 132 (1980) (codified, as amended, in scattered sections of the U.S. Code). This case demands that we determine whether section 114B's immovable prohibition survives section 521's irresistible preemptive sweep. The Massachusetts statute is straightforward. It provides that: "No creditor shall impose a delinquency charge, ____________________ 2Endeavoring to ensure that its flanks are fully protected, Greenwood has prosecuted three separate appeals, each with a different jurisdictional thrust. It is not necessary for us to distinguish among them. 6 late charge, or similar charge on loans made pursuant to . . . an open end credit plan." Mass. Gen. L. ch. 140, 114B. On the other hand, section 521 is equally uncompromising: In order to prevent discrimination against State-chartered insured depository institutions, including insured savings banks, . . . with respect to interest rates, . . . such State bank[s] . . . may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank . . . is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater. 12 U.S.C. 1831(d)(a) (1988 & Supp. 1990). III. III. ____ Discussion Discussion __________ A. A. __ Preemption: General Principles Preemption: General Principles _______________________________ In Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1 (1824), Chief _______ _____ Justice Marshall declared that, under the rubric of the Supremacy Clause,3 state laws which "interfere with, or are contrary to ____________________ 3The Supremacy Clause provides that: This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law 7 the laws of Congress, made in pursuance of the constitution," are preempted and, therefore, invalid. Id. at 211. This verity ___ remains firmly embedded in our modern jurisprudence. See, e.g., ___ ____ Wisconsin Pub. Intervenor v. Mortier, 111 S. Ct. 2476, 2481 ___________________________ _______ (1991); Hillsborough County v. Automated Medical Labs., Inc., 471 ___________________ _____________________________ U.S. 707, 712 (1985); Securities Indus. Ass'n v. Connolly, 883 ________________________ ________ F.2d 1114, 1117 (1st Cir. 1989), cert. denied, 495 U.S. 956 _____ ______ (1990). In placing constitutional theory into practice, the Court has generally distinguished between express and implied preemption. Express preemption occurs "when Congress has 'unmistakably . . . ordained' that its enactments alone are to regulate a [subject, and] state laws regulating that [subject] must fall." Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977) _____ ________________ (quoting Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. _____________________________________ ____ 132, 142 (1963)). In such instances, the only remaining question is whether a particular state statute intrudes into the federal pale. See Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 299 ___ ____________ _________________ (1988); Cable Television Ass'n v. Finneran, 954 F.2d 91, 98 (2d ______________________ ________ Cir. 1992). Implied preemption comes in a wide variety of sizes and shapes. Indeed, we have said that "[t]he concept . . . has a ____________________ of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. U.S. Const., art. VI, cl. 2. 8 certain protean quality, which renders pigeonholing difficult." French v. Pan Am Express, Inc., 869 F.2d 1, 2 (1st Cir. 1989). ______ ____________________ Implied preemption can occur when Congress constructs a scheme of federal regulation "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it"; or when an "Act of Congress . . . touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject"; or when the goals of, and obligations imposed by, the federal law make manifest a purpose to uproot state law. Rice v. ____ Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947); accord __________________________ ______ Mortier, 111 S. Ct. at 2481-82; English v. General Elec. Co., 496 _______ _______ _________________ U.S. 72, 79 (1990). Implied preemption can also occur in situations involving actual conflicts, such as when compliance with both federal and state regulation is an impossibility, see, ___ e.g., Florida Lime, 373 U.S. at 142-43, or when state law "stands ____ ____________ as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 _____ __________ U.S. 52, 67 (1941). Certain common strands bind these diverse species of express and implied preemption together. Two such threads run through the fabric of the instant case. For one thing, in any preemption analysis, "the question of whether federal law preempts a state statute is one of congressional intent." French, 869 F.2d at 2; accord Ingersoll-Rand Co. v. McClendon, ______ ______ __________________ _________ 111 S. Ct. 478, 482 (1990); Securities Indus., 883 F.2d at 1117. _________________ 9 For another thing, the different strains of preemption all operate on "the assumption that the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." Rice, 331 U.S. ____ at 230; see also Mortier, 111 S. Ct. at 2482; California v. ARC ___ ____ _______ __________ ___ America Corp., 490 U.S. 93, 101 (1989). Courts must tread ______________ cautiously in this arena because the authority to displace a sovereign state's law is "an extraordinary power . . . . that we must assume Congress does not exercise lightly." Gregory v. _______ Ashcroft, 111 S. Ct. 2395, 2400 (1991). Even federal statutes ________ that contain express preemption clauses must be viewed through the prism of this assumption. See Cipollone v. Liggett Group, ___ _________ ______________ Inc., 60 U.S.L.W. 4703, 4706-07 (U.S. June 24, 1992) (plurality ____ opinion); id. at 4711 (Blackmun, J., concurring in part and ___ dissenting in part). B. B. __ The Track We Must Travel The Track We Must Travel ________________________ We move now from the general to the particular. Section 521 boasts an express preemption clause. In recent days, the High Court has made it pellucidly clear that, whenever Congress includes an express preemption clause in a statute, judges ought to limit themselves to the preemptive reach of that provision without essaying any further analysis under the various theories of implied preemption. See Cipollone, 60 U.S.L.W. at ___ _________ 4707 (plurality opinion); id. at 4711 (Blackmun, J., concurring ___ in part and dissenting in part). Given the teachings of 10 Cipollone and the plain language of section 521 ("notwithstanding _________ any State constitution or statute which is hereby preempted for the purposes of this section"), we reject the Commonwealth's contention that this is an implied preemption case.4 Our conclusion that the proper analysis in this case reduces to an inquiry into express preemption is unaffected by the fact that the inquiry requires us to interpret the terms "interest" and "interest rates" as they are employed in section 521. While uncertainty about the meaning of interstitial terms in the text of a federal statute may affect the scope of express preemption, it does not bear directly on the character of Congress's preemptory intent. See Cipollone, 60 U.S.L.W. at ___ _________ 4707-10 (plurality opinion); id. at 4711-14 (Blackmun, J., ___ concurring in part and dissenting in part); Cable Television, 954 ________________ F.2d at 98. In other words, so long as Congress's intent to effect preemption remains clear and manifest, uncertainty which pertains only to the contours of the ensuing preemption does not ____________________ 4The district court apparently accepted the Commonwealth's position and treated the case as one of implied preemption. See ___ Greenwood Trust, 776 F. Supp. at 30. It is likely that this _______________ error derived from the miasma of doubt surrounding the applicability of section 521 in Massachusetts. The district court believed that the Commonwealth had exercised its right, under section 525 of DIDA, 12 U.S.C. 1730(g) note (since repealed by Title IV of FIRREA, Pub. L. No. 101-73, 103 Stat. 183, 363 (1989)), to opt out of section 521's preemptive grasp. See, e.g., Greenwood Trust, 776 F. Supp. at 24 n.6, 26, 30 & ___ ____ ________________ n.24, 35. The court overlooked, however, that although Massachusetts opted out in 1981, see 1981 Mass. Acts 231, it ___ reversed direction and, in effect, opted back in well before this litigation began. See 1986 Mass. Acts 177 (repealing pertinent ___ portions of 1981 Mass. Acts 231). Section 521 is, therefore, fully applicable to the instant case. 11 necessitate an alteration of a reviewing court's basic analytic approach. C. C. __ The Scope of Express Preemption under Section 521 The Scope of Express Preemption under Section 521 _________________________________________________ We must still resolve the crucial question of what ____ state laws are preempted. Put specifically, is a state law banning the imposition of late charges a law regulating "interest" within the purview of section 521? If so, chapter 114B is preempted. This inquiry necessarily reduces to ascertaining what Congress meant by the word "interest" in drafting section 521. In divining this legislative intent, it is incumbent upon us to "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Morales v. Trans World Airlines, Inc., _______ __________________________ 112 S. Ct. 2031, 2036 (1992) (quoting FMC Corp. v. Holliday, 111 _________ ________ S. Ct. 403, 407 (1990)). In the process, however, we should not wear blinders: if there is "good reason to believe" that Congress intended to deviate from the ordinary meaning of the language selected, then a reviewing court must follow the congressional lead. Cipollone, 60 U.S.L.W. at 4708 (plurality _________ opinion) (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 97 ____ ______________________ (1983)); see also American Tobacco Co. v. Patterson, 456 U.S. 63, ___ ____ ____________________ _________ 68 (1982). Should perlustration of a statute's text fail to disclose the scope of Congress's preemptory intent, we must then 12 assess the statute's structure and purpose in order to probe Congress's wishes. Ingersoll-Rand, 111 S. Ct. at 482; FMC Corp., ______________ _________ 111 S. Ct. at 407. Moreover, a court, faced with the necessity of delineating a facially cryptic statute's preemptive scope, can repair to statutory history and legislative context in order to facilitate its inquiry into congressional purpose. See Toibb v. ___ _____ Radloff, 111 S. Ct. 2197, 2200 (1991); Blum v. Stenson, 465 U.S. _______ ____ _______ 886, 896 (1984). 1. 1. __ The Commonwealth urges, and the lower court determined, Greenwood Trust, 776 F. Supp. at 36-38, that section 521's ________________ language plainly limits its preemptory impact to state laws that govern numerical interest rates, thereby leaving state laws regulating flat fees unscathed even when, as here, such fees arise out of the extension and maintenance of credit. We are not persuaded that the plain meaning of "interest" and/or "interest rates" as used in section 521 requires so grudging an interpretation. In the first place, we do not believe that the plain meaning of "interest" necessarily restricts the definition of the word to numerical percentage rates. Reference works typically define interest as "a charge for borrowed money[,] generally a _________ percentage of the amount borrowed." Webster's Ninth New _____________________ Collegiate Dictionary 630 (1989) (emphasis supplied); see also _____________________ ___ ____ Black's Law Dictionary 812 (6th ed. 1990). Such definitions do ______________________ not limit interest to numerical percentage rates, for they simply 13 note that interest is often, but not always, expressed as a percentage. If the Commonwealth's circumscribed view of the word were accurate, there would be no basis for suggesting that exceptions exist. Judicial opinions also tend to shy away from limiting the word "interest" to numerical percentage rates. Specifically, federal case law has long suggested that, in ordinary usage, interest may encompass late fees and kindred charges.5 See, ___ e.g., Shoemaker v. United States, 147 U.S. 282, 321 (1893) ____ _________ ______________ ("Interest accrues either by agreement of the debtor to allow it for the use of money, or, in the nature of damages, by reason of the failure of the debtor to pay the principal when due."); Brown _____ v. Hiatts, 82 U.S. (15 Wall.) 177, 185 (1873) ("[i]nterest is the ______ compensation allowed by law, or fixed by the parties, for the use or forbearance of money, or as damages for its detention"). Thus, the door is open to appellant's interpretation of the term. Suggesting that an additional fee attached to a delinquent, defaulted account is related to the creditor's cost of lending that money does no violence to language, to precedent, or, indeed, to logic. Default necessarily increases the ____________________ 5Since we are interpreting the terms of a federal statute in a dispute between Massachusetts and a Delaware bank, we do not believe that definitions of interest emanating from courts in other states are relevant to our inquiry, except insofar as those cases purpose to interpret DIDA or its forebears. In any event, such state-law definitions go both ways. Compare, e.g., Perry v. _______ ____ _____ Stewart Title Co., 756 F.2d 1197, 1207-08 (5th Cir. 1985) (under __________________ Texas law, late charges are not a component of interest) with, ____ e.g., Swindell v. Federal Nat'l Mortgage Ass'n, 409 S.E.2d 892, ____ ________ _____________________________ 894-95 (N.C. 1991) (under North Carolina law, late charges are a component of interest). 14 creditor's cost of processing a loan. Therefore, a late fee is sufficiently related to the "use or forbearance of money, or . . . damages for its detention" that it can appropriately be classified as "interest." In the second place, the use of words like "rate" in conjunction with the word "interest" does little to advance the Commonwealth's thesis. While there may exist support for the assertion that a flat fee is not included in the plain meaning of terms such as "rate" and "interest rates," section 521's preemptive reach cannot so easily be restricted to numerical percentage rates. Terms in an act whose meaning may appear plain outside the scheme of the statute can take on a different meaning when read in their proper context. See United Steelworkers of ___ ______________________ America v. Weber, 443 U.S. 193, 201 (1979); Train v. Colorado _______ _____ _____ ________ Pub. Interest Research Group, Inc., 421 U.S. 1, 10 (1976). As ___________________________________ Judge Learned Hand once wrote, words can be "chameleons, which reflect the color of their environment." Commissioner v. ____________ National Carbide Corp., 167 F.2d 304, 306 (2d Cir. 1948), aff'd, _______________________ _____ 336 U.S. 422 (1949). In short, the plain-meaning doctrine is not a pedagogical absolute. This rule of construction is more "an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence" in contradiction to supposedly plain meaning if such evidence exists. Boston Sand & _____________ Gravel Co. v. United States, 278 U.S. 41, 48 (1928) (Holmes, J.). __________ _____________ Hence, a court must always hesitate to construe words in a 15 statute according to their apparent meaning if to do so would defeat Congress's discovered intendment. See Bob Jones Univ. v. ___ _______________ United States, 461 U.S. 574, 586 (1983); Watt v. Alaska, 451 U.S. _____________ ____ ______ 259, 266 (1981); Church of the Holy Trinity v. United States, 143 __________________________ _____________ U.S. 457, 459 (1892). It follows that: deference to the plain meaning rule should not be unthinking or blind. We would go beyond the plain meaning of the statutory language when adherence to it would produce an absurd result or an unreasonable one plainly at variance with the policy of the legislation as a whole. Massachusetts Fin. Servs., Inc. v. Securities Investor Protection _______________________________ ______________________________ Corp., 545 F.2d 754, 756 (1st Cir. 1976) (citations and internal _____ quotation marks omitted), cert. denied, 431 U.S. 904 (1977); _____ ______ accord In re Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643 ______ _______________________________________ (1978). Viewed as part of this mise-en-scene, the Commonwealth's plain-meaning argument cannot carry the day. The argument gathers little steam because the use of the terms "interest" and "interest rates" in section 521 is an example of how phrases' meanings can take on different colorations when read in their legislative and historical context. Accordingly, we must move beyond the plain-meaning doctrine to determine the scope of express preemption under section 521. 2. 2. __ The preamble to section 521 states that the law was created "to prevent discrimination against State-chartered insured depository institutions, including insured savings 16 banks." To understand the reference, we examine the historical context. As the 1970s wound down, the Nation was caught in the throes of a devastating credit crunch. Interest rates soared. See, e.g., United States v. Ven-Fuel, Inc., 758 F.2d 741, 764 ___ ____ ______________ ______________ n.20 (1st Cir. 1985) (cataloguing fluctuations in the prime rate from 1975 to 1983). Nevertheless, state lending institutions were constrained in the interest they could charge by state usury laws which often made loans economically unfeasible from a lender's coign of vantage. See Gavey Properties/762 v. First ___ ____________________ _____ Fin. Sav. & Loan, 845 F.2d 519, 521 (5th Cir. 1988); Bank of New ________________ ____________ York v. Hoyt, 617 F. Supp. 1304, 1309 (D.R.I. 1985). National ____ ____ banks did not share this inhibition because they could charge whatever interest rates were allowed under the National Bank Act of 1864, ch. 106, 13 Stat. 99 (1864) (codified, as amended, in scattered sections of 12 U.S.C.) (the Bank Act), and specifically, those rates which were permitted under Bank Act 85, 12 U.S.C. 85 (1988), quoted infra note 7. Since section 85 _____ authorized national banks to use interest rates set by reference to federal discount rates, state institutions were at an almost insuperable competitive disadvantage.6 ____________________ 6Section 85 was originally enacted to shield national banks from state laws that were discriminating against them. See ___ Marquette Nat'l Bank v. First of Omaha Serv. Corp., 439 U.S. 299, ____________________ __________________________ 314-18 (1978); Cong. Globe, 38th Cong., 1st Sess. 2126 (1864) (statement of Sen. Sherman). More than a century later, this shield had become a sword wielded by national banks against state-chartered lenders. As we have written before, "irony is no stranger to the law." Amanullah v. Nelson, 811 F.2d 1, 18 (1st _________ ______ Cir. 1987). 17 Congress tried to level the playing field between federally chartered and state-chartered banks when it enacted DIDA. See 126 Cong. Rec. 6,907 (1980) (section 521 will "allow[] ___ competitive equity among financial institutions, and reaffirm[] the principle that institutions offering similar products should be subject to similar rules") (statement of Sen. Bumpers); 126 Cong. Rec. 6,900 (1980) (section 521 should "provide[] parity, or competitive equality, between national banks and State[- ]chartered depository institutions on lending limits") (statement of Sen. Proxmire). To achieve this objective, Congress engrafted onto DIDA's bare bones, at several points, language taken from the Bank Act. Section 521, modeled on section 85 of the Bank Act, was the site of one such transplantation.7 The parallelism ____________________ 7We consider the transplanted language to be the following: [A state-chartered, federally insured depository institution], with respect to interest rates, . . . may . . . take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank . . . is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater. 12 U.S.C. 1831(d)(a) (DIDA 521). The comparison between this language and the language of section 85 is striking. The latter provided in relevant part: [A national bank] may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidence of debt, interest at the 18 was not mere happenstance. To the exact contrary, Congress made a conscious choice to incorporate the Bank Act standard into DIDA. See, e.g., 126 Cong. Rec. 6,907 (1980) (statement of Sen. ___ ____ Bumpers); 125 Cong. Rec. 30,655 (1979) (statement of Sen. Pryor); see also Gavey, 845 F.2d at 521. ___ ____ _____ The historical record clearly requires a court to read the parallel provisions of DIDA and the Bank Act in pari materia. __ ____ _______ It is, after all, a general rule that when Congress borrows language from one statute and incorporates it into a second statute, the language of the two acts should be interpreted the same way. See Morales, 112 S. Ct. at 2037; Ingersoll-Rand, 111 ___ _______ ______________ S. Ct. at 485-86; Oscar Mayer & Co. v. Evans, 441 U.S. 750, 756 __________________ _____ (1979). So here. What is more, when borrowing of this sort occurs, the borrowed phrases do not shed their skins like so many reinvigorated reptiles. Rather, "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. _____________________________________________ ____________________ rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater . . . . 12 U.S.C. 85 (1988) (Bank Act 85). Although there are niggling variations, the key phraseology is substantially identical. Accord Gavey, 845 F.2d at 521 (interpreting 12 U.S.C. ______ _____ 1730(g)(a), a section of DIDA containing language parallel to section 521). 19 527, 537 (1947). Because we think it is perfectly plain that this portable soil includes prior judicial interpretations of the transplanted language, see Holmes v. Securities Investor ___ ______ ____________________ Protection Corp., 112 S. Ct. 1311, 1317-18 (1992); Pierce v. _________________ ______ Underwood, 487 U.S. 552, 567 (1988); Lorillard v. Pons, 434 U.S. _________ _________ ____ 575, 580-81 (1978), Bank Act precedents must inform our interpretation of words and phrases that were lifted from the Bank Act and inserted into DIDA's text. While we believe that several principles inherent in section 85 were transfused into section 521, the critical item for present purposes is the principle of exportation. This principle, solidly embedded in the language and purpose of both acts, provides the mechanism whereby a bank may continue to use the favorable interest laws of its home state in certain transactions with out-of-state borrowers.8 See Marquette Nat'l ___ _______________ Bank v. First of Omaha Serv. Corp., 439 U.S. 299, 313-19 (1978); ____ ___________________________ Gavey, 845 F.2d at 521. To the extent that a law or regulation _____ enacted in the borrower's home state purposes to inhibit the bank's choice of an interest term under section 521, DIDA expressly preempts the state law's operation. Read in this way, the language borrowed from Bank Act 85 and incorporated into DIDA 521 achieves parity between national banks and their state-chartered counterparts by allowing ____________________ 8The exportable rates are those available to the most favored lenders in the bank's state, not merely those available to lenders of a similar size, character, or function. See ___ Tiffany v. National Bank of Missouri, 85 U.S. (18 Wall.) 409, _______ ___________________________ 411-13 (1874). 20 lenders such as Greenwood to choose among three interest rate ceilings: (1) the highest rate lawfully permitted without reference to section 521; (2) a rate not more than one percent above the discount rate on 90-day commercial paper in effect at the Federal Reserve Bank in the federal reserve district where the lender is located; or (3) the highest rate allowed by the laws of the state where the lender is located. Section 521's express preemption clause is designed to maintain this parity. Acting in combination with the principle of exportation, this clause necessarily derails any state-sponsored attempt to regulate the maximum interest chargeable by a federally insured bank chartered in another state. For our purposes, this means that any Massachusetts law applicable to Greenwood must yield to the preemptory force of section 521 insofar as the regulation of "interest" is concerned. We reach this conclusion mindful of the fact that the state statute here at issue visits two areas which are squarely within the ambit of the states' historic powers banking, see, ___ e.g., Northeast Bancorp, Inc. v. Board of Governors of the ____ ________________________ ____________________________ Federal Reserve Sys., 472 U.S. 159, 177 (1985); Valley Bank v. _____________________ ___________ Plus Sys., Inc., 914 F.2d 1186, 1195 (9th Cir. 1990), and _________________ consumer protection. See, e.g., ARC America, 490 U.S. at 101; ___ ____ ___________ General Motors Corp. v. Abrams, 897 F.2d 34, 41-42 (2d Cir. ______________________ ______ 1990). Although this circumstance means that any preemption provision must be construed cautiously and with due regard for state sovereignty, see Cipollone, 60 U.S.L.W. at 4706-07 ___ _________ 21 (plurality opinion); id. at 4711 (Blackmun, J., concurring in ___ part and dissenting in part), it does not serve as a buckler against the force of the Supremacy Clause. When Congress has acted within its authority and its intent to displace state law is clear preconditions which obtain here preemption is not foreclosed by the fact that the federal statute intrudes into the range of subjects over which the states have traditionally exercised their police powers.9 See Fidelity Fed. Sav. & Loan ___ __________________________ Ass'n v. De La Cuesta, 458 U.S. 141, 153 (1982). _____ ____________ 3. 3. __ To be sure, the impuissance of the Commonwealth's plain-meaning argument signifies only that the terms "interest" and "interest rates" as used in section 521 are susceptible to interpretation not that the Commonwealth's interpretation of those terms is necessarily wrong or that the appellant's interpretation is necessarily correct. To like effect, our recognition of DIDA's ancestry, while illuminating, provides us with no definitive answer to the precise question at hand. Since DIDA's text and legislative history are, at bottom, inconclusive, we must look either to federal common law or to state law to give content to the terms in question. In general, the words and phrases contained in a federal statute are defined by reference to federal law. See ___ ____________________ 9By the same token, the relative importance of a state law to a state sovereign is immaterial when that law is displaced by a valid federal statute, for the Framers provided that the federal law must prevail. See Free v. Bland, 369 U.S. 663, 666 ___ ____ _____ (1962). 22 Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 43 ___________________________________ _________ (1989); Jerome v. United States, 318 U.S. 101, 104 (1943). There ______ _____________ are two compelling reasons for adhering to this praxis. First, application of state-law definitions may threaten the policies or interests which a federal statute is designed to serve. See ___ United States v. Kimbell Foods, Inc., 440 U.S. 715, 728 (1979); _____________ ____________________ Burks v. Lasker, 441 U.S. 471, 479 (1979). Second, application _____ ______ of state-law definitions may disrupt Congress's desire for nationwide uniformity under a federal statute. See Kamen v. ___ _____ Kemper Fin. Servs., Inc., 111 S. Ct. 1711, 1717 (1991); ___________________________ Mississippi Band, 490 U.S. at 43-44. ________________ Resort to uniquely federal definitions is not, however, automatic. "Congress sometimes intends that a statutory term be given content by the application of state law." Mississippi ___________ Band, 490 U.S. at 43. In such instances, a federal court may ____ properly use state law to fill the interstices within a federal legislative scheme. See, e.g., Kamen, 111 S. Ct. at 1722-23 ___ ____ _____ (holding it proper to borrow a definition from state corporate law); Mississippi Band, 490 U.S. at 47-53 (allowing state-law ________________ definition of "domicile" to inform a federal definition); Federal _______ Election Comm'n v. National Right to Work Comm., 459 U.S. 197, ________________ _____________________________ 204-05 (1982) (similar, in corporate-law context); De Sylva v. _________ Ballentine, 351 U.S. 570, 580-81 (1956) (borrowing definition __________ from state domestic relations law); Reconstruction Fin. Corp. v. _________________________ Beaver County, 328 U.S. 204, 208-10 (1946) (borrowing definition _____________ from state property law). This "does not mean that a State would 23 be entitled to use [a statutory term] in a way entirely strange to those familiar with its ordinary usage, but at least to the extent that there are permissible variations in the ordinary concept [of that term] we [may] deem state law controlling." De __ Sylva, 351 U.S. at 581. _____ In this case, we need not decide whether federal or state law is the appropriate point of reference. Since both sources produce the same result, it would be a mere matter of form and idle to choose between them. See Royal Business ___ ______________ Group, Inc. v. Realist, Inc., 933 F.2d 1056, 1064 (1st Cir. 1991) ___________ _____________ (eschewing choice of law where, whatever the choice, the result of the litigation would not be affected); Fashion House, Inc. v. ___________________ K Mart Corp., 892 F.2d 1076, 1092 (1st Cir. 1989) ("When a ______________ choice-of-law question has been reduced to the point where nothing turns on more precise refinement, that should be the end of the matter."). We illustrate briefly. a. a. __ Section 521 allows a state bank to charge interest "at the rate allowed by the laws of the State . . . where the bank is located." We think this is a fairly clear indication that, if a state-law definition of interest is applicable, it must emanate from Delaware law. We so hold, much bolstered by the recognition that section 85 "adopts the entire case law of [a state bank's home] state interpreting the state's limitations on usury; it does not merely incorporate the numerical rate adopted by the state." First Nat'l Bank v. Nowlin, 509 F.2d 872, 876 (8th Cir. ________________ ______ 24 1975); accord Roper v. Consurve, Inc., 777 F. Supp. 508, 510-11 ______ _____ ______________ (S.D. Miss. 1990), aff'd, 932 F.2d 965 (5th Cir.) (table), cert. _____ _____ denied, 112 S. Ct. 181 (1991). Our conclusion is further ______ fortified by the knowledge that several other federal tribunals, in addition to the Nowlin and Roper courts, have interpreted ______ _____ identical language in section 85 of the Bank Act as adopting definitions drawn from the law of the state where the bank is located. See, e.g., Daggs v. Phoenix Nat'l Bank, 177 U.S. 549, ___ ____ _____ __________________ 555 (1900); Union Nat'l Bank v. Louisville, N.A. & C. Ry., 163 _________________ __________________________ U.S. 325, 331 (1896); NCNB Nat'l Bank v. Tiller, 814 F.2d 931, _______________ ______ 937 (4th Cir. 1987), overruled on other grounds by Busby v. Crown _____________________________ _____ _____ Supply, Inc., 896 F.2d 833, 840-42 (4th Cir. 1990) (en banc); ____________ Bartholomew v. Northampton Nat'l Bank, 584 F.2d 1288, 1295 (3d ___________ _______________________ Cir. 1978); McAdoo v. Union Nat'l Bank, 535 F.2d 1050, 1055-58 ______ _________________ (8th Cir. 1976); Northway Lanes v. Hackley Union Nat'l Bank & ______________ ____________________________ Trust Co., 464 F.2d 855, 861-64 (6th Cir. 1972). _________ Delaware law explicitly incorporates late charges into the definition of interest and allows lenders to assess such fees against credit-card customers. See Del. Code Ann. tit. 5, 950 ___ (1985 & Supp. 1990). Thus, were we to look to Delaware law for help in fathoming the meaning of "interest" and "interest rates," late charges would be included. In that event, section 114B's prohibition on late fees would be nullified by section 521's express preemption of state laws limiting exported interest rates. b. b. __ 25 Federal common law brings us to precisely the same result. Several courts, in analyzing the language of section 85 of the Bank Act, have had little trouble in construing the term "interest" to encompass a variety of lender-imposed fees and financial requirements which are independent of a numerical percentage rate. See, e.g., American Timber & Trading Co. v. ___ ____ ______________________________ First Nat'l Bank, 690 F.2d 781, 787-88 (9th Cir. 1982) __________________ (compensating balance requirement); Fisher v. First Nat'l Bank, ______ _________________ 548 F.2d 255, 258-61 (8th Cir. 1977) (fee for cash advance); Panos v. Smith, 116 F.2d 445, 446-47 (6th Cir. 1940) (taxes and _____ _____ recording fees); Cronkleton v. Hall, 66 F.2d 384, 387 (8th Cir.) __________ ____ (bonus or commission paid to lender), cert. denied, 290 U.S. 685 _____ ______ (1933); Nelson v. Citibank (South Dakota) N.A., ___ F. Supp. ___, ______ ____________________________ ___ (D. Minn. 1992) [1992 W.L. 112166 at *6-*9] (late fees). Fairly read, these opinions expand the scope of section 85 preemption and, by implication, the scope of section 521 preemption well beyond periodic percentage rates.10 ____________________ 10The court below relied upon the legislative history of DIDA 501, 12 U.S.C. 1735f-7a, to support the proposition that late charges are not a component of interest under section 521. Greenwood Trust, 776 F. Supp. at 29-32. Congress enacted section _______________ 501 as an amendment to the National Housing Act, while section 521 altered the Federal Deposit Insurance Act. The mere fact that both of these sections fell under the broad umbrella of DIDA does not make them fair congeners. Since DIDA contains an amalgam of different provisions, the legislative history and purpose of one section of DIDA does not necessarily inform the interpretation of all other parts of that law. See Bank of New ___ ___________ York, 617 F. Supp. at 1311-13. As we have stated, "it is not ____ unusual for the same word to have differing connotations in the same act and surely no canon of statutory construction forecloses courts from attributing to the word the meaning which the legislature intended that it should have in each instance." Sherman v. Hamilton, 295 F.2d 516, 520 (1st Cir. 1961), cert. _______ ________ _____ 26 While we are aware that many of these cases involve the intrastate extension of loans by national banks rather than the exportation of interest rates, the analogy is persuasive. Furthermore, some of them do involve exportation. For example, Fisher concerned a credit-card cash advance fee charged by a ______ Nebraska bank to a customer residing in Iowa. The court suggested that this fee was a component of the "rate of interest," making no distinction between the meaning of "interest" in intrastate, as opposed to interstate, transactions. Fisher, 548 F.2d at 258-61. For our part, we can discern no ______ principled basis for such a distinction. 4. 4. __ It is, moreover, obvious that construing the terms "interest" and "interest rates" to include late charges fits most comfortably with the rationale undergirding section 521. DIDA was enacted in order to strike a competitive balance between state and national lending institutions by giving them equal power in charging interest rates. Allowing state banks to charge the same or similar fees in connection with the extension and ____________________ denied, 369 U.S. 820 (1962); see also Dewsnup v. Timm, 112 S. Ct. ______ ___ ____ _______ ____ 773, 777-78 (1992). This sentiment seems especially apropos in view of the fact that section 501 addresses different categories of lenders and loans and contains materially different preemption terms than does section 521. In light of the irrefutable evidence that section 521 was conceived as an offspring of section 85 of the Bank Act, we believe that the district court's reliance upon a comparison between it and DIDA 501 was misplaced. The proper analogy in this case is to compare lineal descendants who share common language and purpose, not distant cousins who share little more than a name. 27 maintenance of credit as national banks are allowed to charge ensures parity between the two types of institutions. Such a construction also finds broad support in the rulings and informal opinion letters of the various agencies charged with interpreting the meaning of section 85 and section 521. See, e.g., 12 C.F.R. 7.7310(a) (1992) (ruling of the ___ ____ Comptroller of the Currency to the effect that all of a bank's home-state laws "material to the determination of the interest rate" are exportable); Letter by Robert B. Serino, Deputy Chief Counsel of the Office of the Comptroller of Currency, [1988-1989 Transfer Binder] Fed. Banking L. Rep. (CCH) 85,676 (Aug. 11, 1988) (concluding that, under Bank Act 85, state-law prohibition of late charges may be preempted); Letter by Harry W. Quillian, Acting General Counsel of the Federal Home Loan Bank Board 3 (June 27, 1986) (similar; interpreting DIDA 522).11 We need not grease the rails. Given our conclusion that DIDA 521 should be interpreted in pari materia with its __ ____ _______ direct lineal ancestor, section 85 of the Bank Act, and given, also, the litany of cases extending section 85 to a wide variety of fees and charges associated with the extension and maintenance of credit, we see no reason to define either the term "interest" or the term "interest rates," for purposes of section 521, in a manner that excludes late fees. IV. IV. ___ ____________________ 11We need not join the parties' heated debate over the level of deference these materials deserve, for we would reach the same result independent of any reliance on them. 28 Conclusion Conclusion __________ When Congress furnishes clear and unequivocal evidence of its preemptory mindset in the text of a statute, the "task of discerning congressional intent is considerably simplified." Ingersoll-Rand, 111 S. Ct. at 482. Here, section 521 provides ______________ with undeniable clarity that usury laws in effect in the borrower's state may be preempted as applied to federally insured banks chartered in other states. With respect to the specific scope of section 521's preemption, section 85 of the Bank Act long ago laid the track upon which the parties must now travel. Section 85's preemption acts as a cowcatcher by brushing aside states' attempts to regulate "interest rates" charged by national banks. Included within those displaced state laws are regulations regarding flat fees analogous to late charges. In passing DIDA, Congress expressly placed section 521 on the same footing. Hence, "interest" in section 521 encompasses late fees charged to credit-card customers. Section 114B, which prohibits the assessment of late charges, thereby regulates the interest a bank may charge in a more restrictive manner than federal law permits. We need go no further.12 For the reasons set forth above, it is patent that the state statute is on a collision ____________________ 12Inasmuch as we conclude that section 114B is preempted, we need not confront various other issues addressed by the court below. See Greenwood Trust, 776 F. Supp. at 39-47. We take no ___ ________________ view of any such issues. 29 course vis-a-vis section 521. Given the imperatives of the Supremacy Clause, the whistle sounds loud and clear. Section 114B must yield. It is preempted. Reversed. Reversed. ________ 30